Filed 3/27/17  Certified for publication as modified 4/19/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SHANTEL JACKSON, | B266466 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC555566) |
| v. | |
| FLOYD MAYWEATHER, JR., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Suzanne G. Bruguera, Judge.  Reversed in part and affirmed in part.

Rick Edwards, Inc. and Rick Edwards for Defendant and Appellant.

Allred Markoko & Goldberg, Michael Maroko, Marcus Spiegel, and John S. West for Plaintiff and Respondent.

————————

Following the final breakup of what she has described as a physically and verbally abusive relationship with former boxing champion Floyd Mayweather, Jr., Shantel Jackson sued Mayweather for, among other claims, invasion of privacy (both public disclosure of private facts and false light portrayal), defamation and intentional and negligent infliction of emotional distress. Those five causes of action were based, either entirely or in substantial part, on Mayweather's social media postings about the termination of Jackson's pregnancy and its relationship to the couple's separation and his comments during a radio interview concerning the extent to which Jackson had undergone cosmetic surgery procedures. Mayweather filed a special motion to strike those causes of action pursuant to Code of Civil Procedure section 425.16 (section 425.16). The trial court denied the motion. We reverse that ruling with respect to Jackson's claims for defamation and false light portrayal, as well as her cause of action for public disclosure of private facts based on Mayweather's comments about Jackson's cosmetic surgery.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Jackson's Complaint*

Jackson's complaint, filed September 4, 2014, recounted a detailed story of the on-again, off-again abusive relationship between a young aspiring model and actress and a highly successful, well-known professional boxer. Jackson, then 21 years old, met Mayweather while working as a hostess at an event in Atlanta in 2006. The two dated and developed a romantic, intimate relationship. Jackson soon moved to Las Vegas to live with Mayweather.

Jackson and Mayweather were a highly publicized celebrity couple for a number of years and were at one point engaged to be

2

married. However, the relationship frayed. Jackson alleged that in August 2012, shortly after Mayweather's release from jail following his conviction on a domestic violence charge involving another woman, she and Mayweather had an argument during which he twisted her arm, choked her and forcibly took away her cell phone so he could look through it. The couple reconciled after Mayweather apologized and promised he would never again assault Jackson.

In early April 2013, after continued difficulties between them, Jackson decided to end her relationship with Mayweather and moved to Los Angeles. Mayweather persuaded her to try again to make the relationship work, and Jackson returned to Las Vegas two weeks later. However, within a few days the couple resumed arguing, and Jackson again told Mayweather she was going to leave him. At one point during this period Mayweather grabbed Jackson, restrained her and pointed a gun at her foot while asking, "Which toe do you want me to shoot?" Jackson alleged that while forcibly restraining her and with the gun still pointing at her, Mayweather said he would not allow her to leave. He then removed a $2.5 million diamond ring from her finger and took earrings and other jewelry she was wearing. That same evening Mayweather directed a member of his staff to take additional items of Jackson's personal property, which he had stored at a secret location. During this period, according to Jackson, Mayweather kept her a virtual prisoner in his Las Vegas home, monitoring her activities and only allowing her to leave if accompanied by one of his employees.

Jackson moved back to Los Angeles in June 2013. The following month she discovered someone had broken into a storage unit she rented in Southern California and stolen

personal property she valued at more than $1 million. Mayweather subsequently confessed he had arranged for the removal of the items and told Jackson he would return them if she came back to him.  In late July 2013 Mayweather told Jackson he would "put things out about" her unless she agreed to return to Las Vegas.  When she refused to return, Mayweather posted her Los Angeles address on his social media pages and falsely suggested he lived there.  Jackson alleged she became concerned for her safety when Mayweather's fans came to the address and then were disappointed to learn he was not there.

Mayweather continued to importune Jackson to return to him and to attempt to make their relationship work.  Jackson agreed but said she would maintain her own home in California. In November 2013 Jackson became pregnant by Mayweather. Jackson alleged she told Mayweather and one friend of her pregnancy, but no one else.  A December 2013 sonogram revealed Jackson was carrying twins.  At Mayweather's request Jackson gave him a copy of the sonogram.  According to the complaint, "In January of 2014, Ms. Jackson's pregnancy terminated and Mr. Mayweather was so informed."

When Jackson refused to move back to Las Vegas during this period, Mayweather became verbally abusive and threatening.  During an argument in February 2014 in Los Angeles, Mayweather once again physically restrained Jackson, blocking the door to his condominium and preventing her from leaving for more than one hour.

On April 12, 2014 Jackson attended a basketball game with the rapper Nelly and posted a photograph of the two of them on her social media pages.  Mayweather threatened to post photographs he had taken of Jackson sleeping naked if she did

4

not take down the Nelly photograph.  Jackson rejected the demand and also refused to reconcile with Mayweather.  In response, on May 1, 2014 Mayweather posted on his Facebook and Instagram accounts, "the real reason me and Shantel Christine Jackson @MissJackson broke up was because she got an abortion, and I'm totally against killing babies.  She killed our twin babies.  #ShantelJackson #Floyd Mayweather #TheMoneyTeam #TMT."  Mayweather also posted a copy of the sonogram of the twin fetuses and a summary medical report regarding the pregnancy.  Media outlets, including TMZ, republished the sonogram and medical report.  The following day Mayweather again discussed Jackson's abortion during a radio interview and also stated she had undergone extensive cosmetic surgery procedures.

Based on the allegations regarding Mayweather's posting of information about Jackson's pregnancy and its termination, including the sonogram and medical report, and the broadcast of the statement she had cosmetic surgery on her face and body, Jackson's complaint asserted causes of action for invasion of privacy (public disclosure of private facts), invasion of privacy (false light portrayal) and defamation.  Other general allegations served as the bases for causes of action for conversion, replevin/possession of personal property, battery, assault and false imprisonment.  Incorporating all of the allegations by reference Jackson also asserted causes of action for intentional infliction of emotional distress, negligent infliction of emotional distress and civil harassment.

2. *The Special Motion To Strike*
  a. *The moving papers*

Mayweather responded to Jackson's complaint by filing a special motion to strike five of the complaint's 11 causes of action: the two privacy causes of action, the defamation cause of action and the causes of action for intentional and negligent infliction of emotion distress. Mayweather argued these claims fell within the ambit of section 425.16 because he and Jackson were in the public eye and abortion is a topic of widespread public interest. In support of the first point Mayweather presented evidence that Jackson had promoted her own status as a celebrity and had 47,145 Twitter followers in January 2012 and 78,628 Twitter followers by mid-September 2013, as well as 174,000 Instagram followers in November 2013 and more than 258,000 by May 2014. She also had her own website and, with Mayweather's assistance, had appeared on the Howard Stern radio program and on television.

Contending there was no merit to Jackson's claims, Mayweather argued Jackson had surrendered her right to privacy when she made herself newsworthy by virtue of her relationship with Mayweather. She had willingly participated in publication of private details about that relationship (her reaction to sharing Mayweather with other women was given as an example). Accordingly, the reason for the relationship's demise was equally newsworthy. As for the defamation and false light claims, in his moving papers Mayweather asserted in summary fashion there was no evidence the challenged statements were false or had been made with actual malice. Finally, Mayweather argued, because there was no evidence of falsity or constitutional malice, the First Amendment protected

6

his posts and comments from Jackson's claims the statements had intentionally or negligently caused Jackson extreme emotional distress.

b. *Jackson's opposition*

In her declaration filed in opposition to the special motion to strike, Jackson essentially repeated the narrative concerning her relationship with Mayweather contained in her complaint. With respect to Mayweather's May 1, 2014 post that he had ended their relationship because of the abortion, Jackson declared, "He knew that the real reason I would not come back to him was because he wouldn't change his ways"—that is, Mayweather would not alter his abusive behavior toward her. She further declared she considered her pregnancy, the termination of the pregnancy and her medical reports to be private information, something that Mayweather knew.

With respect to the radio broadcast on May 2, 2014, Jackson declared that any cosmetic surgery procedures she had undergone were confidential. Moreover, during that broadcast Mayweather had falsely said she had cosmetic surgery to change her nose, chin and cheeks. Based on their long relationship and prior discussions, Jackson declared, Mayweather knew that statement was false. In addition, during the same broadcast Mayweather had falsely claimed she terminated the pregnancy because she was concerned about her looks and "didn't want to mess my body up." According to Jackson the postings and false statements by Mayweather caused a massive negative public reaction, which included death threats and offensive comments describing her as a "baby killer" and a "whore."

In her legal memorandum in opposition to the motion, Jackson argued Mayweather's conduct giving rise to her claims—

his disregard for her medical privacy—was entirely unrelated to the public debate over abortion.

        c. *Mayweather's reply*

In reply papers Mayweather emphasized that Jackson's evidentiary presentation had not disputed she was a public figure and had publicized intimate aspects of her relationship with Mayweather prior to their final breakup. He also noted Jackson did not deny abortion was an issue of significant public interest or that there was widespread interest in the couple's breakup and the reasons for it. He also contended that Jackson had conceded in her complaint that she had undergone cosmetic surgery (on her breasts and buttocks, Mayweather stated) and that in the radio interview he had not said she had work done on her nose, cheeks and chin, only that "a lot of pretty women" had. Finally, Mayweather argued the real reason for the end of their relationship (indeed, of any relationship) was a matter of opinion, not a provable fact that could support a defamation cause of action.

        3. *The Trial Court's Order Denying the Motion*

The trial court denied Mayweather's motion in a 10-page ruling. The court first found that Mayweather had satisfied his burden of showing the five causes of action arose from protected activity within the meaning of section 425.16, subdivision (e)(3) and (4). The court explained abortion is an issue of widespread interest, Jackson was a person in the public eye, and Jackson's relationship with Mayweather was a matter of public interest and media attention. However, the court concluded Jackson had established a likelihood of prevailing on each of her claims. Citing case law, the court reasoned that whether Mayweather's statements were subject to a newsworthy privilege or were

8

otherwise protected by the First Amendment depended on contemporary standards and thus was largely a question of fact for a jury to decide.  The court also ruled that Jackson's evidence was sufficient to establish a prima facie case that Mayweather knowingly disseminated false information concerning the reasons for the couple's breakup and the extent of Jackson's cosmetic surgery.

## DISCUSSION

1. *Section 425.16:  The Anti-SLAPP Statute*[1]

Section 425.16 provides, "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)  Pursuant to subdivision (e), an "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes:  (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection

---

[1]     SLAPP is an acronym for "strategic lawsuit against public participation."  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 815, fn. 1.)

9

with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

In ruling on a motion under section 425.16, the trial court engages in what is now a familiar two-step process. "First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).)

      a. *Step one*

The moving party's burden on the threshold issue is to show "the challenged cause of action arises from protected activity." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056; see *Baral, supra,* 1 Cal.5th at p. 396 ["[a]t the first step, the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them"].) "[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.] In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.] 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause [of action] fits one of the categories spelled out in section 425.16, subdivision (e) . . . .'" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.)

10

"When relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at [the first] stage.  If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached."  (*Baral*, *supra*, 1 Cal.5th at p. 396.)  However, "if the allegations of protected activity are only incidental to a cause of action based essentially on nonprotected activity, the mere mention of the protected activity does not subject the cause of action to an anti-SLAPP motion."  (*Scott v. Metabolife Internat., Inc.* (2004) 115 Cal.App.4th 404, 414; accord, *Kenne v. Stennis* (2014) 230 Cal.App.4th 953, 967-968; *World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1574.)

   b.  *Step two*

  At the second step of the section 425.16 procedure, "the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated.  The court, without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment."  (*Baral*, *supra*, 1 Cal.5th at p. 396; accord, *Zamos v. Stroud* (2004) 32 Cal.4th 958, 965.)  Nonetheless, the court should grant the motion "'if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.'"  (*Taus v. Loftus* (2007) 40 Cal.4th 683, 714; accord, *Baral*, at p. 385 [the court "accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law"]; *Zamos*, at p. 965.)

11

c. *Burden of proof and standard of review*

The defendant has the burden on the first issue; the plaintiff has the burden on the second issue. (*Chodos v. Cole* (2012) 210 Cal.App.4th 692, 701; *Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 928.) We review the trial court's rulings independently under a de novo standard of review. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325; *Rusheen v. Cohen, supra,* 37 Cal.4th at p. 1055.)

2. *The Challenged Causes of Action Arose from Protected Activity Under Section 426.16, Subdivision (e)(3)*

a. *The statements were made in a public forum*

Mayweather's postings on his Facebook page and Instagram account and his comments about Jackson during a radio broadcast were all made "in a place open to the public or a public forum" within the meaning of section 425.16, subdivision (e)(3). "Web sites accessible to the public . . . are 'public forums' for purposes of the anti-SLAPP statute." (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 41, fn. 4; accord, *Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 693; *Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1366; see *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 895 [statements published on defendant's website "hardly could be more public"].) Similarly, statements during a radio interview meet subdivision (e)(3)'s public forum requirement. (*Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 807 [public forum requirement satisfied where "[t]he offending comments arose in the context of an on-air discussion between the talk-radio cohosts and their on-air producer"]; see *Ingels v. Westwood One Broadcasting Services, Inc.* (2005) 129 Cal.App.4th 1050, 1063 [radio call-in talk show].)

12

b. *The statements concerned an issue of public interest*

Although Jackson concedes that discussion of the ethical or moral issues surrounding abortion involves a public issue, she argues Mayweather's actions were not connected to any legitimate public interest in abortion and, therefore, the trial court erred in finding the gravamen of her claims was based on Mayweather's protected activity. Rather, she insists, the principal thrust of her action was harassment, not speech. Accordingly, whether or not we agree Jackson established a probability of prevailing on each of her claims against Mayweather, she contends the trial court's order denying the motion to strike should be affirmed.[2]

Jackson is correct that, simply because a general topic is an issue of public interest, not every statement somewhat related to that subject is also a matter of public interest within the meaning of section 425.16, subdivision (e)(3) or (e)(4). For example, in *Dual Diagnosis Treatment Center, Inc. v. Buschel* (2016) 6 Cal.App.5th 1098 the Court of Appeal held, while discussion of drug and alcohol rehabilitation services may well be an issue of public interest, the licensing status of a single rehabilitation facility—at issue in the case before it—was not. (*Id.* at pp. 1105-1106 ["[t]here is no showing that the San Clemente rehabilitation facility impacts, or has the potential to impact a broad segment of society, or that the statements were part of some larger goal to provide consumer protection

---

[2] No cross-appeal is needed for Jackson to make this argument. (Code Civ. Proc., § 906; see *Mayer v. C.W. Driver* (2002) 98 Cal.App.4th 48, 57 [respondent permitted to raise argument without cross-appeal that trial court reached right result "even if on the wrong theory"].)

information"; "[a]lmost any statement, no matter how specific, can be construed to relate to some broader topic"].) Similarly, in *Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595, 601, the Court of Appeal held that advertising claims relating to the promised benefits of a specific herbal supplement did not concern an issue of public interest even if a broader discussion of alternative medicine or herbal supplements in general might. (See *Bikkina v. Mahadevan* (2015) 241 Cal.App.4th 70, 84 [defendant's statements "were only remotely related to the broader subject of global warming or climate change, and involved specific accusations of plagiarism and use of a contaminated sample"]; *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 111, disapproved on another ground in *Baral, supra*, 1 Cal.5th at p. 392 [although pollution is a matter of general public interest, defendants' alleged statements "were not about pollution or potential public health and safety issues in general, but about [the plaintiffs'] specific business practices" and thus were not protected activity within the meaning of § 425.16]; compare *Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 34 [information about protecting consumers from investment scams might be an issue of public interest but statements concerning a company's investigatory services are not] with *Wong v. Jing, supra*, 189 Cal.App.4th at p. 1367 [web posting was of public interest because it dealt with more general issue of effects of dentists' use of certain products, not just a highly critical opinion of a particular dentist].)

Unlike the trial court we doubt whether Mayweather's assertion Jackson had an abortion, his posting of a copy of the sonogram of the twin fetuses or his personal statement of

14

opposition to "killing babies" contributed to the public debate on women's reproductive rights. (See *Wilbanks v. Wolk, supra*, 121 Cal.App.4th at p. 898 ["it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate"]; cf. *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 23-24 [website posting not only criticized a widely known plastic surgeon but also contained information concerning "'nightmare' results that necessitated extensive revision surgery," thereby contributing to the general debate of "pros and cons of undergoing cosmetic surgery"].)

But we need not resolve that issue; for the evidence unequivocally established, as Jackson concedes, that she and Mayweather are both high profile individuals who were subject to extensive media scrutiny. As such, Mayweather's postings and comments concerning his relationship with Jackson, as well as Jackson's pregnancy, its termination and her cosmetic surgery, were "celebrity gossip" properly considered, under established case law, as statements in connection with an issue of public interest: "In general, '[a] public issue is implicated if the subject of the statement or activity underlying the claim . . . was a person or entity in the public eye." (*D.C. v. R.R.* (2010) 182 Cal.App.4th 1190, 1215; accord, *Seelig v. Infinity Broadcasting Corp.*, *supra*, 97 Cal.App.4th at p. 807 [comments about a contestant on a popular, reality-style television program]; *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 239-240 [article about personal life of a nationally known political consultant].)[3]

---

[3] Arguably Mayweather's postings of a copy of the sonogram and summary of Jackson's medical report are "conduct" in "furtherance of his right of free speech" within the meaning of

15

This aspect of the threshold requirements of section 425.16 was thoroughly explored by our colleagues in Division Three of this court in *Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, an invasion of privacy action filed by Marlon Brando's retired housekeeper, a beneficiary named in Brando's will. The housekeeper sued the producers of the television program *Celebrity Justice*, who had broadcast a taped interview of the housekeeper at her nursing home. The housekeeper denied authorizing either the interview or its broadcast. The Court of Appeal reversed the denial of an anti-SLAPP motion filed by the producers, explaining, "The public's fascination with Brando and widespread public interest in his personal life made Brando's decisions concerning the distribution of his assets a public issue or an issue of public interest. Although [the housekeeper] was a private person and may not have voluntarily sought publicity or to comment publicly on Brando's will, she nevertheless became involved in an issue of public interest by virtue of being named in Brando's will. Defendants' television broadcast contributed to the public discussion of the issue by identifying [the housekeeper] as a beneficiary and showing her on camera. We conclude that the acts from which the complaint arises . . . constituted conduct in furtherance of the defendants' right of free speech 'in connection with a public issue or an issue of public interest' (§ 425.16, subd. (e)(4))." (*Id.* at p. 1347.)

Mayweather, like Brando, is someone whose professional accomplishments and private life have generated widespread

section 425.16, subdivision (e)(4), rather than a "statement" or "writing" in a public forum under subdivision (e)(3). However, subdivision (e)(4), like (e)(3), applies when the challenged act concerns "an issue of public interest."

16

public interest.  A world champion boxer in five different weight divisions, he was at one time listed as the highest paid athlete in the world.  In April 2013, while the events at issue in Jackson's complaint were occurring, Mayweather was the subject of a one-hour primetime network documentary and appeared frequently as a guest on television and radio programs.  According to the declaration filed in support of his special motion to strike, Mayweather had "millions of social media followers."  Unlike Brando's retired housekeeper, however, the evidence also demonstrated that Jackson willingly participated in publication of information about her own life and her relationship with Mayweather that others—that is, those who did not aspire to a career in modeling and the entertainment industry—might well consider private.  Indeed, according to Mayweather, Jackson asked him to help her become famous, which he did.

In sum, whether or not part of a larger campaign of harassment, as alleged by Jackson, Mayweather established that Jackson's causes of action for invasion of privacy and defamation, as well as for intentional and negligent infliction of emotional distress to the extent based on his social media postings and radio interview comments, arose from protected activity under section 425.16.  (See *Olive Properties, L.P. v. Coolwaters Enterprises, Inc.* (2015) 241 Cal.App.4th 1169, 1175 ["'In the context of the anti-SLAPP statute, the "gravamen is defined by the *acts on which liability is based*."  [Citation.]  The "focus is on the principal thrust or gravamen of the causes of action, i.e., *the allegedly wrongful and injury-producing conduct* that provides the foundation for the claims."'"]; *Old Republic Construction Program Group v. The Boccardo Law Firm, Inc.* (2014) 230 Cal.App.4th 859, 868 ["a cause of action arises from protected

conduct if the *wrongful, injurious act(s)* alleged by the plaintiff constitute protected conduct"].) The burden thus shifted to Jackson to demonstrate each challenged claim based on protected activity was legally sufficient and factually substantiated. (*Baral, supra*, 1 Cal.5th at p. 396.)

3. *Jackson Failed To Demonstrate a Probability of Prevailing on Her Cause of Action for Defamation and Most Aspects of Her Causes of Action for Invasion of Privacy*

Jackson's causes of action for public disclosure of private facts, false light portrayal and defamation are based on Mayweather's May 1, 2014 social media postings regarding the termination of her pregnancy and his reaction to it and on his subsequent statements regarding her cosmetic surgery. Although combined in Jackson's pleading, each set of disclosures is asserted as a ground for relief under the three legal theories advanced in the invasion of privacy and defamation counts of her complaint. Accordingly, as explained last year in *Baral, supra*, 1 Cal.5th 376, the second step of the analysis under section 425.16 requires Jackson to separately establish a probability of prevailing on each distinct claim for relief within the three causes of action: "[T]he plaintiff must make the requisite showing as to each challenged claim that is based on allegations of protected activity." (*Baral*, at p. 392; see *id.* at p. 395 ["[n]either the form of the complaint nor the primary right at stake is determinative"].)

Jackson's causes of action for intentional and negligent infliction of emotional distress, however, present an issue regarding so-called "mixed causes of action" not directly addressed in *Baral*. Although Jackson suggests that

18

Mayweather's comments regarding the termination of her pregnancy and his statements concerning cosmetic surgery, at least when considered together, constituted outrageous behavior that caused her severe emotional suffering, when fairly read, these tort claims challenge Mayweather's entire course of conduct toward her as she ended her relationship with him—not only the social media postings and radio comments but also Mayweather's threats and other retributive behavior. That is, neither claim is predicated solely on protected activity, but neither are those allegations "merely incidental" or "collateral" to the claims for relief. (Cf. *Baral, supra*, 1 Cal.5th at p. 394 ["[a]ssertions that are 'merely incidental' or 'collateral' are not subject to section 425.16"].) Accordingly, in evaluating Jackson's probability of prevailing on those two claims, a court would necessarily look at the evidence concerning the entire range of Mayweather's alleged misconduct, not simply the protected activity.

> a. *Invasion of privacy: public disclosure of private facts*

"[U]nder California common law the dissemination of truthful, newsworthy material is not actionable as a publication of private facts." (*Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 215 (*Shulman*).) To establish tort liability for this type of invasion of privacy,[4] the plaintiff must plead and prove (1) public disclosure (2) of a private fact (3) that would be offensive and objectionable to the reasonable person and (4) is not

---

[4] California courts have recognized four distinct types of right of privacy claims: "(1) intrusion upon one's physical solitude or seclusion; (2) public disclosure of private facts; (3) false light in the public eye; and (4) appropriation." (*Forsher v. Bugliosi* (1980) 26 Cal.3d 792, 808.)

of legitimate public concern.  (*Taus v. Loftus*, *supra*, 40 Cal.4th at p. 717; *Shulman*, at p. 214.)  With respect to the fourth element, the Supreme Court held in *Shulman*, and reaffirmed in *Taus*, that "newsworthiness" is a complete bar to liability for publication of truthful information.  (*Taus*, at p. 717 & fn. 14; *Shulman*, at p. 215.)  In analyzing the element of newsworthiness, appellate decisions "balance[] the public's right to know against the plaintiff's privacy interest by drawing a protective line at the point the material revealed ceases to have any substantial connection to the subject matter of the newsworthy report."  (*Schulman*, at p. 224.)

Although "legitimate public interest does not include 'a morbid and sensational prying into private lives *for its own sake*'" (*Shulman*, *supra*, 18 Cal.4th at p. 224), the protection accorded the right to disseminate truthful information by both the common law and the constitutional guarantee of freedom of expression "'appl[ies] with equal force to the publication whether it be a news report or an entertainment feature . . . .'  Thus, newsworthiness is not limited to 'news' in the narrow sense of reports of current events.  'It extends also to the use of names, likenesses or facts in giving information to the public for purposes of education, amusement or enlightenment, when the public may reasonably be expected to have a legitimate interest in what is published.'"  (*Id.* at p. 225; see *id.* at p. 226 ["[i]ntensely personal or intimate revelations might not, in a given case, be considered newsworthy, especially where they bear only slight relevance to a topic of legitimate public concern"].)

The question whether a publication was newsworthy is different, in both a legal and practical sense, from whether it was offensive within the meaning of the private facts tort.  Jackson's

20

pregnancy, the subsequent termination of that pregnancy—whether by abortion (which she has neither admitted nor denied) or otherwise—and her use of cosmetic surgery to enhance her appearance would, under many circumstances, be considered intensely private information; and its unwanted disclosure might well be offensive to a reasonable person.  (Cf. *Taus v. Loftus*, *supra*, 40 Cal.4th at pp. 733-734 ["personal information about a person that happens to be known by the person's relatives or close friends is not information that has entered the public domain"].)  Nonetheless, at a time when entertainment news and celebrity gossip often seem to matter more than serious policy discussions, given Jackson's high profile and voluntary disclosure on social media of many aspects of her personal life, the publication of those otherwise intimate facts must necessarily be considered newsworthy under the broad definition of that term developed and applied by the Supreme Court and courts of appeal:  "[T]here is a public interest which attaches to people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities.  Certainly, the accomplishments and way of life of those who have achieved a marked reputation or notoriety by appearing before the public such as actors and actresses [and] professional athletes, . . . may legitimately be mentioned and discussed in print or on radio or television.  Such public figures have to some extent lost the right of privacy, and it is proper to go further in dealing with their lives and public activities than with those of entirely private persons." (*Carlisle v. Fawcett Publications, Inc*. (1962) 201 Cal.App.2d 733, 746-747; accord, *Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 677-678; see *Michaels v. Internet Entertainment Group, Inc*. (C.D.Cal.

21

1998) 5 F.Supp.2d 823, 840 ["[n]ewsworthiness is defined broadly [by the California courts] to include not only matters of public policy, but any matter of public concern, including the accomplishments, everyday lives, and romantic involvements of famous people"]; see generally *Shulman*, *supra*, 18 Cal.4th at p. 228 [court may conclude "the disputed material was newsworthy as a matter of law"].)

Although Jackson cannot base her private facts cause of action on Mayweather's disclosures that she had an abortion and had undergone cosmetic surgery, Mayweather's posting of the sonogram of the twins Jackson had been carrying before her pregnancy terminated and the summary medical report regarding her pregnancy falls outside the protection accorded a newsworthy report. On this record at least, publishing those images served no legitimate public purpose, even when one includes entertainment news within the zone of protection. Rather, Mayweather's Internet display of this material appears equivalent to the unauthorized distribution of photographs of a decapitated accident victim that the Court of Appeal in *Catsouras v. Department of California Highway Patrol* (2010) 181 Cal.App.4th 856 held properly served as the basis for an invasion of privacy action by the decedent's family.

The *Catsouras* court recognized that surviving family members have no right of privacy arising from discussions of the life of a decedent, but held they do have a common law privacy right in the death images of the decedent. (*Catsouras v. Depatment of California Highway Patrol, supra*, 181 Cal.App.4th at pp. 863-864.) After quoting *Shulman* for the elements of a claim of invasion of privacy based on the public disclosure of private facts, the *Catsouras* court acknowledged such images may

involve issues of public interest. (*Id.* at p. 874.)[5] However, citing *Diaz v. Oakland Tribune, Inc.* (1983) 139 Cal.App.3d 118, 126, the *Catsouras* court explained, "morbid and sensational eavesdropping or gossip 'serves no legitimate public interest and is not deserving of protection.'" (*Catsouras*, at p. 874; see *Michaels v. Internet Entertainment Group, Inc.*, *supra*, 5 F.Supp.2d at p. 839 ["While [Bret] Michael's voluntary assumption of fame as a rock star throws open his private life to some extent, even people who voluntarily enter the public sphere retain a privacy interest in the most intimate details of their lives. [Citations] [¶] . . . Because they sought fame, [Pamela Anderson] Lee and Michaels must tolerate some public exposure of the fact of their involvement. [Citation.] The fact recorded on the [disputed sex t]ape, however, is not that Lee and Michaels were romantically involved, but rather the visual and aural details of their sexual relations, facts which are ordinarily considered private even for celebrities."].)

Jackson has made a prima facie showing that Mayweather's publication of the sonogram and summary medical report, like the *Catsouras* photographs and Michaels-Lee sex tape, involved a "morbid and sensational" prying into her private life and thus constituted a cognizable basis for her invasion of privacy claim. Accordingly, Jackson adequately demonstrated a

---

[5] The court also found that additional constitutional concerns should be addressed if the plaintiff were seeking to impose civil liability for invasions of privacy against a media defendant, rather than law enforcement officers who had distributed photographs of the victim of an automobile accident with no law enforcement purpose. (*Catsouras v. Department of California Highway Patrol, supra*, 181 Cal.App.4th at p. 874.)

23

probability of prevailing on her cause of action for public disclosure of private facts based on the posting of these two items. To that limited extent only, we affirm the trial court's ruling denying the special motion to strike as directed to Jackson's first cause of action for invasion of privacy.[6]

---

[6] Mayweather's suggestion that First Amendment decisions from the United States Supreme Court preclude imposition of tort liability for publication of lawfully acquired, truthful information, no matter how sensitive it may be and without regard to its newsworthiness, is misplaced. Reviewing the relevant cases in *Gates v. Discovery Communications, Inc.* (2004) 34 Cal.4th 679, 694-695, the California Supreme Court explained, as it had previously in *Shulman*, *supra*, 18 Cal.4th at pages 214-218, that the issue of newsworthiness had not been given extensive consideration by the United States Supreme Court because the cases it considered involved public records made available to the press, and its concern was the press's responsibility to report the operations of government, including judicial proceedings, not disclosure of intimate details of the plaintiff's private life. Neither the United States Supreme Court nor the California Supreme Court has held the First Amendment necessarily precludes an invasion of privacy claim based on allegations of harm caused by the publication of facts, as here, obtained from a nonpublic source. (See, e.g., *The Florida Star v. B.J.F.* (1989) 491 U.S. 524, 541 [109 S.Ct. 2603, 105 L.Ed.2d 443] ["We do not hold that truthful publication is automatically constitutionally protected, or that there is no zone of personal privacy within which the State may protect the individual from intrusion by the press, or even that a State may never punish publication of the name of a victim of a sexual offense. We hold only that where a newspaper publishes truthful information which it has lawfully obtained, punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order, and that no such interest is satisfactorily

24

b. *Defamation*

"'The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage.'" (*John Doe 2 v. Superior Court* (2016) 1 Cal.App.5th 1300, 1312; accord, *Taus v. Loftus*, *supra*, 40 Cal.4th at p. 720; *Wong v. Jing*, *supra*, 189 Cal.App.3d at p. 1369.) "In general, . . . a written communication that is false, that is not protected by any privilege, and that exposes a person to contempt or ridicule or certain other reputational injuries, constitutes libel." (*Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1242.) The defamatory statement must specifically refer to, or be "of or concerning," the plaintiff. (*Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042.)

"If the person defamed is a public figure,[7] he cannot recover unless he proves, by clear and convincing evidence . . . ,

---

served by imposing liability under [the state statute at issue here] to appellant under the facts of this case."].)

[7] As the United States Supreme Court explained in *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 351 [94 S.Ct. 2997, 41 L.Ed.2d 789], the public-figure designation "may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." (Accord, *Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 263 ["There are two types of public figures: 'Some occupy positions of such persuasive power and influence that they are

25

that the libelous statement was made with "'actual malice'"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'" (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 256; accord, *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 344-345 [94 S.Ct. 2997, 41 L.Ed.2d 789] [public figures may prevail in a libel action only if they prove that the defendant's defamatory statements were made with actual knowledge of falsehood or reckless disregard for the truth]; see *Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 84.)[8] "The rationale for such differential treatment is, first, that the public figure has greater access to the media and therefore greater opportunity to rebut defamatory statements, and second, that those who have become public figures have done so voluntarily and therefore 'invite attention and comment.'"

---

deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.'"].)

Jackson does not dispute that she is properly considered a public figure by reason of her celebrity status for purposes of her invasion of privacy and defamation causes of action.

[8] The term "actual malice" adopted by the United States Supreme Court in *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed. 2d 686] is now sometimes referred to as "constitutional malice" to distinguish it from the malice requirement for recovery of punitive damages under state law as defined in Civil Code section 3294 (also known as "malice-in-fact"). (See *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 745; *Nadel v. Regents of University of California* (1994) 28 Cal.App.4th 1251, 1258, fn. 1.)

(*Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 398.)

Because a defamatory statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability. (*GetFugu, Inc. v. Patton Boggs LLP* (2013) 220 Cal.App.4th 141, 155; *Summit Bank v. Rogers*, *supra*, 206 Cal.App.4th at p. 695.) "Though mere opinions are generally not actionable [citation], a statement of opinion that implies a false assertion of fact is . . . ." (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 289; accord, *GetFugu*, at p. 156.) Thus, the "inquiry is not merely whether the statements are fact or opinion, but '"whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact."'" (*Hawran*, at p. 289; see *Summit Bank*, at p. 696 ["where an expression of opinion implies a false assertion of fact, the opinion can constitute actionable defamation"]; *Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385 ["the question is not strictly whether the published statement is fact or opinion," but "[r]ather, the dispositive question is whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact"].)

Jackson's complaint identified as the basis for her defamation claim Mayweather's May 1, 2014 social media posts that the real reason their relationship ended was Jackson's abortion and his May 2, 2014 statements during a radio interview that she had undergone extensive cosmetic surgery procedures. According to Jackson, she, not Mayweather, ended their relationship; she did so because he would not change his ways (that is, because of his abusive behavior); and Mayweather's

27

contrary explanation was deliberately false. Mayweather, in response, has argued the reason a couple ended their relationship is necessarily a matter of opinion and, therefore, cannot be the basis for a defamation cause of action. He also argues his comments about Jackson's plastic surgery were in substance true, even if Jackson's surgery did not include all the body parts to which he alluded. Although Mayweather's analysis with respect to the May 1, 2014 postings is flawed, we agree Jackson failed to demonstrate a probability of prevailing as to either basis for her defamation claim.

The breakup of a romantic relationship can be mutual or unilateral. While it may be difficult in some instances to sort out which party initiated the separation (or whether both did), Mayweather's unequivocal statement that he ended his lengthy relationship with Jackson is an assertion of fact capable of being proved true or false, not opinion. Similarly, his explanation that he acted as he did because of his strong negative views on abortion is a statement of fact that is either true or false. Jackson's declaration contesting the truth of these statements— that she, not Mayweather, initiated the breakup; and she ended the relationship because he refused to reform his abusive behavior—if credited, established that Mayweather made a provably false assertion of fact and did so knowingly, that is with constitutional malice.

But more is required. Given that Jackson has not contested the truth of Mayweather's declaration that she had an abortion, the statement that Mayweather ended his relationship with Jackson for that reason does not appear to be defamatory. On its face, the allegedly false part of the posts (the cause of the breakup) did not expose Jackson to contempt, ridicule or other

28

reputational injury.  (See Civ. Code, § 45 [defining libel]; *Shively v. Bozanich*, *supra*, 31 Cal.4th at p. 1242.)  Indeed, the evidence Jackson presented of negative public reaction and the emotional distress she suffered as a result of Mayweather's May 1, 2014 posts focused on the abortion of the twin fetuses, not Mayweather's role in, or reasons for, ending the couple's relationship.  The May 1, 2014 posts do not support Jackson's claim for defamation.

As for Mayweather's comments during the May 2, 2014 radio interview, Jackson does not contest the fact that she has had cosmetic surgery.  However, she declared in opposition to Mayweather's motion that he had falsely stated she had surgery to change her nose, chin and cheeks.[9]  Moreover, she asserted,

---

[9] According to a transcript of the radio interview filed with Jackson's opposition papers, Mayweather said, "Every time we get to talking, well, this girl don't look better than me.  That girl don't look better than me.  That girl has a fake booty.  Look at that girl with the fake breast, but I am more like, everything you you got on you is fake.  You got a fake butt.  You got fake titties. I mean, you got work done on your face; so it is more like you talk about everybody, but you are the one that – you are doing the same thing."  Later in the interview Mayweather said, "A lot of pretty women are very insecure because if you feel like you were just a naturally beautiful woman, don't mess with your nose. Don't mess with your cheeks.  Don't mess with your chin.  Don't mess with your breast. You know, don't mess with your ass, but even if she didn't want to do that . . . even if she did want to do that, I loved you from the beginning, no matter how your face look.  How your breast looked.  How your butt looked.  Anybody is entitled to do what they want to do, but just don't criticize and talk about other people doing it when everything on you is— everything on you is work . . . ."

29

"[b]ased on our long relationship and prior discussions, he knew those were false statements."

In this court Jackson argues, without citation to evidence in the record or legal authority, that the false assertion her entire appearance was the result of cosmetic surgery was damaging to her career. What she fails to address even in this conclusory fashion, however, is how Mayweather's exaggeration of the extent of cosmetic surgery she tacitly concedes she had (on her breasts and buttocks) created a different and negative effect on the radio audience from that which the truth would have produced. As Mayweather argues, falsity cannot be shown if the challenged statements appear substantially true: "To bar liability, "'it is sufficient if the *substance* of the charge be proved true, irrespective of slight inaccuracy in the details." [Citations] . . . [Citation.] . . . Minor inaccuracies do not amount to falsity so long as "the substance, the gist, the sting, of the libelous charge be justified." [Citations.] Put another way, the statement is not considered false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced.""" (*Vogel v. Felice* (2005) 127 Cal.App.4th 1006, 1021; accord, *GetFugu, Inc. v. Patton Boggs LLP*, *supra*, 220 Cal.App.4th at p. 154 ["'[m]inor inaccuracies do not amount to falsity so long as "the substance, the gist, the sting, of the libelous charge be justified"'"]; *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 344-345 [a statement is not considered false unless it would have a different effect on the mind of the reader from that which the truth would have produced].)

It is certainly conceivable that surgical enhancement of the face is different for the reputation of an actress or model from the augmentation or sculpting of other parts of her body. But

30

Jackson presented no evidence in opposition to Mayweather's motion, expert or otherwise, that would permit a finder of fact to draw that distinction. It was her burden to do so. Thus, the radio comments concerning cosmetic surgery do not support a defamation cause of action.

In her opposition papers in the trial court and again on appeal, Jackson contends she was also defamed by Mayweather's false statement during the May 2, 2014 radio interview that she had the abortion, at least in part, because she was concerned about the impact of pregnancy and child birth on her appearance. But whatever possible merit that claim may have, Jackson failed to include it in her complaint. On review of a special motion to strike pursuant to section 425.16, we must take the complaint as it is. (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2006) 136 Cal.App.4th 464, 476.) "In order to establish a probability of prevailing on the claim (§ 425.16, subd. (b)(1)), a plaintiff responding to an anti-SLAPP motion must "'state[] and substantiate[] a legally sufficient claim.'" [Citations.] Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821; accord, *Baral*, *supra*, 1 Cal.5th at pp. 384-385 [in ruling on a special motion to strike the court's inquiry "is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment"]; *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820; *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123.) Nor can Jackson amend her complaint to

31

cure this deficiency: "A plaintiff cannot avoid [an anti-]SLAPP motion by amending the complaint." (*Hansen v. California Department of Corrections & Rehabilitation* (2008) 171 Cal.App.4th 1537, 1547; accord, *Contreras v. Dowling* (2016) 5 Cal.App.5th 394, 411-412 ["'[a] plaintiff . . . may not seek to subvert or avoid a ruling on an anti-SLAPP motion by amending the challenged complaint . . . in response to the motion'"]; *Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049, 1055; see *Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068, 1073 [§ 425.16 makes no provision for amending the complaint; "we reject the notion that such a right should be implied"].)

In sum, the trial court erred in denying Mayweather's special motion to strike directed to Jackson's defamation claims.

### c. *Invasion of privacy: false light portrayal*

"False light is a species of invasion of privacy, based on publicity that places a plaintiff before the public in a false light that would be highly offensive to a reasonable person, and where the defendant knew or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed." (*Price v. Operating Engineers Local Union No. 3* (2011) 195 Cal.App.4th 962, 970.) "A 'false light' claim, like libel, exposes a person to hatred, contempt, ridicule, or obloquy and assumes the audience will recognize it as such." (*M.G. v. Time Warner, Inc.* (2001) 89 Cal.App.4th 623, 636.) "'A "false light" cause of action is in substance equivalent to a libel claim, and should meet the same requirements of the libel claim, including proof of malice [where malice is required for the libel claim].'" (*Medical Marijuana, Inc. v. ProjectCBD.com* (2016) 6 Cal.App.5th 602, 616; accord, *Aisenson v. American*

*Broadcasting Co.* (1990) 220 Cal.App.3d 146, 161; see generally *Fellows v. National Enquirer, Inc.* (1986) 42 Cal.3d 234 [holding statutory limitations on defamation actions apply when a false light action is based on publication that is defamatory].) Indeed, "[w]hen a false light claim is coupled with a defamation claim, the false light claim is essentially superfluous, and stands or falls on whether it meets the same requirements as the defamation cause of action." (*Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1385, fn. 13.)

In her brief Jackson acknowledges her false light claim is based on the same statements as the cause of action for disclosure of private facts—that is, Mayweather's assertion that he broke off the couple's relationship because Jackson had an abortion and his comments that she had cosmetic surgery on her face, as well as other parts of her body.[10] Those claims suffer from the same fatal defects as Jackson's defamation claim: Mayweather's allegedly false explanation for the couple's breakup did not expose Jackson to "hatred, contempt, ridicule, or obloquy"; his exaggerated description of the extent of Jackson's cosmetic surgery was, in substance, truthful. Neither statement is sufficient to establish a prima facie case for false light portrayal.

---

[10] Jackson also argues Mayweather's statement during the May 2, 2014 radio interview that she had the abortion because she "did not want to mess up" her body falsely portrayed her as vain and selfish. As discussed, Jackson's complaint did not identify that statement or allege it as the basis for any of her tort claims. Accordingly, it is not properly considered in determining whether she has established a reasonable probability of prevailing on her false light claim.

d. *Intentional and negligent infliction of emotion distress*

A cause of action for intentional infliction of emotional distress exists when there has been (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff has suffered severe or extreme emotional distress; and (3) the defendant's outrageous conduct was the actual and proximate causation of the emotional distress. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050; *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1001.) "A defendant's conduct is 'outrageous' when it is so ""extreme as to exceed all bounds of that usually tolerated in a civilized community."" [Citation.] And the defendant's conduct must be ""intended to inflict injury or engaged in with the realization that injury will result."""" (*Hughes*, at pp. 1050-1051.)

"Liability for intentional infliction of emotional distress '"does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." [Citation.]' [Citations] . . . . [¶] With respect to the requirement that a plaintiff show severe emotional distress, [the Supreme Court] has set a high bar. 'Severe emotional distress means "'emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.""" (*Hughes v. Pair*, *supra*, 46 Cal.4th at p. 1051.) It is for the court to determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. (*Chang v. Lederman* (2009) 172 Cal.App.4th 67, 87; *Fowler v. Varian Associates, Inc.* (1987) 196 Cal.App.3d 34, 44.)

None of the postings or broadcast comments alleged in Jackson' complaint, whether considered individually or collectively, may fairly be characterized as atrocious conduct intolerable in a civilized society, even Mayweather's posting of Jackson's sonogram and summary medical report, the only arguably tortious acts challenged by the special motion to strike. (See *Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 496 ["[t]he rough edges of our society are still in need of a good deal of filing down and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that definitely inconsiderate or unkind"]; see also *Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594, 1609.) As summarized in comment d to the Restatement Second of Torts, section 46, cited in *Hughes v. Pair*, *supra*, 46 Cal.4th at page 1051 and many other appellate decisions considering this element of the tort, "It has not been enough that the defendant has acted with an intent to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (Cf. *Comstock v. Aber* (2012) 212 Cal.App.4th 931, 954 [allegation that employee had falsely accused fellow employee of committing a sexual assault in a report to a nurse and the employer's human resources department insufficient to constitute extreme and outrageous conduct].)

But as Jackson explains in her respondent's brief, her cause of action for intentional infliction of emotional distress "is based upon the entire range of Mayweather's conduct toward Ms. Jackson." Mayweather's section 425.16 motion, of course, does not challenge the nonspeech aspects of this claim—allegations that Mayweather engaged in a campaign of harassment, including verbal and physical abuse, that began long before the May 1 and 2, 2014 public disclosures. Accordingly, although Mayweather's social media postings and comments regarding Jackson during the radio interview may not, without more, serve as the basis for a claim of intentional or negligent infliction of emotional distress (see *Baral*, *supra*, 1 Cal.5th at p. 392; see also *Reader's Digest Assn. v. Superior Court*, *supra*, 37 Cal.3d at p. 265 ["liability cannot be imposed on any theory for what has been determined to be a constitutionally protected publication"]),[11] evidence of those postings and comments may

---

[11] There is no independent tort of negligent infliction of emotional distress. (*Potter v. Firestone Tire & Rubber Co.*, *supra*, 6 Cal.4th at p. 984.) "The tort is negligence, a cause of action in which a duty to the plaintiff is an essential element. [Citations.] That duty may be imposed by law, be assumed by the defendant, or exist by virtue of a special relationship. [Citation.] [¶] . . . [U]nless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by that breach of duty. Even then, with rare exceptions, a breach of the duty must threaten physical injury, not simply damage to property or financial interests." (*Id.* at pp. 984-985.) Whether Jackson's alleged severe or extreme emotional distress was proximately

properly be considered by a jury (or in connection with a motion for summary judgment) when evaluating the merits of this claim.

## DISPOSITION

The order denying the special motion to strike is reversed with respect to Jackson's causes of action for defamation and false light portrayal and her cause of action for public disclosure of private facts based on Mayweather's comments about cosmetic surgery. In all other respects the order is affirmed. The parties are to bear their own costs on appeal.

PERLUSS, P. J.

We concur:

ZELON, J.

SEGAL, J.

---

caused by Mayweather's breach of a cognizable legal duty is not a question we need decide.

Filed 4/19/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SHANTEL JACKSON,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>FLOYD MAYWEATHER, JR.,<br><br>        Defendant and Appellant. | B266466<br><br>(Los Angeles County<br>Super. Ct. No. BC555566)<br><br>ORDER CERTIFYING<br>OPINION FOR<br>PUBLICATION AND<br>MODIFYING OPINION |

THE COURT:

The opinion in this case filed March 27, 2017 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the party of interest's request pursuant to California Rules of Court, rule 8.1120(a) for publication is granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

The court has read and considered appellant's petition for rehearing filed April 10, 2017. The court construes the petition to be a request for modification.

IT IS FURTHER ORDERED that the opinion be modified as follows:

1. The last sentence of the first paragraph on page 2, beginning, "We reverse that ruling" is deleted and the following sentence is inserted in its place:

We reverse that ruling with respect to Jackson's claims for defamation and false light portrayal, as well as her cause of action for public disclosure of private facts based on Mayweather's statements that Jackson had an abortion and his comments about her cosmetic surgery.

2. On page 6, in the first sentence of section 2 a, the word emotion is changed to emotional.

3. At the top of page 34, the word emotion in subheading d is changed to emotional.

4. On page 34, the disposition paragraph is deleted and the following is inserted in its place.

The order denying the special motion to strike is reversed with respect to Jackson's causes of action for defamation and false light portrayal and her cause of action for public disclosure of private facts based on Mayweather's statements that she had an abortion and his comments about cosmetic surgery. In all other respects the order is affirmed. The parties are to bear their own costs on appeal.

There is no change in the judgment.

_____

PERLUSS, P. J.          ZELON, J.          SEGAL, J.

2