Filed 5/25/22  Calvert v. Fox Television Stations, LLC CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| JAY W. CALVERT et al., | B310772 |
| Plaintiffs and Respondents, | |
| v. | (Los Angeles County Super. Ct. No. 20STCV21742) |
| FOX TELEVISION STATIONS, LLC et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephanie M. Bowick, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Davis Wright Tremaine, Kelli L. Sager, Dan Laidman and Sarah Burns for Defendants and Appellants Fox Television Stations, LLC, William Melugin, Daniel Leighton and Kris Knutsen.

Jeff Lewis Law, Jeffrey Lewis and Sean C. Rotstan for Defendant and Appellant Michael Houston.

Johnson & Johnson, Neville L. Johnson, Douglas L. Johnson, Aleeza L. Marashlian; and Rodney A. Smolla for Plaintiffs and Respondents.

_____

Fox Television Stations, LLC (Fox), William Melugin, Daniel Leighton, and Kris Knutsen (collectively, the Fox defendants) and Michael Houston appeal from orders denying their special motions to strike (Code Civ. Proc., § 425.16; anti-SLAPP statute)[1] the complaint filed by Dr. Jay W. Calvert, a nationally recognized plastic surgeon, and Jay Calvert, M.D., Professional Corporation (the professional corporation) (collectively, the Calvert plaintiffs).  This case arises from the Fox defendants broadcasting and publishing news reports about a civil lawsuit filed against Dr. Calvert by his former patient Natalie West alleging insurance fraud and medical battery.  The reports included statements by Houston that Dr. Calvert had similarly committed acts of insurance fraud in treating him.  In response, the Calvert plaintiffs sued the Fox defendants and Houston for defamation.  The trial court found that although the defamation claims arose from protected activity, the Calvert plaintiffs had shown a probability of prevailing on their claims.

On appeal, the Fox defendants and Houston contend Fox's reporting, including its interview with Houston, is absolutely

_____

[1]     "SLAPP is an acronym for 'strategic lawsuits against public participation.'"  (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 413, fn 2.)

2

privileged under Civil Code section 47, subdivision (d),[2] as a fair and true report of a judicial proceeding. Further, the Calvert plaintiffs failed to plead and prove actual malice. The Fox defendants and Houston also argue several of the statements at issue do not constitute actionable defamation.

We agree the Calvert plaintiffs failed to carry their burden to show probability of success on the merits of their defamation claims against the Fox defendants, and we reverse the trial court's order denying the Fox defendants' special motion to strike. However, as to Houston, we conclude Dr. Calvert (but not his professional corporation) carried his burden to show probability of success on his claims against Houston. We therefore affirm the trial court's order denying Houston's special motion to strike as to Dr. Calvert but reverse as to the professional corporation.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   *The Fox Defendants' Reporting on Dr. Calvert*[3]

    1.   *West's lawsuit against Dr. Calvert*

On May 31, 2018 West filed a lawsuit against Dr. Calvert, the professional corporation, the University of Southern California (USC), and others, alleging causes of action for fraud,

---

[2]   All further undesignated statutory references are to the Civil Code.

[3]   The factual background is taken from the undisputed facts alleged in the complaint and the declarations and documents submitted in support of and in opposition to the special motions to strike.

medical battery, breach of contract, and forcible sexual penetration of an unconscious person with a foreign object.[4] (*West v. Calvert et al.* (Super. Ct. Los Angeles County, 2018, No. BC708415).) West alleged in her second amended complaint that in 2013 Dr. Calvert performed a cosmetic nasal surgery to reconstruct West's nose after a failed reconstructive surgery by another doctor. West paid for the surgery in full, but Dr. Calvert fraudulently billed West's medical insurer for the procedure by falsely characterizing the surgery as a medically necessary correction of a nasal airway obstruction.

West alleged that after the surgery, Dr. Calvert told her the surgery had been "a complete success" but he needed to do two "'tweaks'" in a second surgery. From 2013 through 2017, Dr. Calvert persuaded West to undergo 12 additional unnecessary and harmful nasal surgeries, in order to bill West's insurance carrier for additional procedures. West alleged these surgeries included "multiple unconsented procedures." Further, Dr. Calvert fraudulently double billed for each surgery, requiring West to pay out of pocket while also billing West's insurance carrier for the same work. West alleged Dr. Calvert "essentially treat[ed]" West's health insurance policies as "his own personal ATM machine."

West alleged she consented to have Dr. Calvert perform a procedure on May 31, 2017, but she later learned a USC fellow had performed the surgery. West also alleged that following a nasal surgery performed by Dr. Calvert on September 16, 2014, she suffered severe uterine cramping and discharge. West

---

[4] Only the Fox defendants' and Houston's motions to strike the Calvert plaintiffs' complaint are at issue in this appeal.

4

alleged she was sexually assaulted while under anesthesia during the procedure by an unknown USC student, resident, or fellow who was "attempt[ing] to practice some unknown medical procedure involving [West's] uterus without her prior knowledge or consent." (Italics omitted.) West alleged Dr. Calvert failed to prevent the sexual assault.

> 2. *Letters from Dr. Calvert's counsel to Leighton and Melugin*

On April 25, 2019 Dr. Calvert's attorney, Arthur H. Barens, in response to an inquiry regarding Fox-owned television station KTTV's intention to broadcast a report on West's allegations against Dr. Calvert, wrote to KTTV senior producer Leighton, requesting Leighton review West's medical files before airing the report. Barens denied Dr. Calvert "acted inappropriately in either his medical treatment or billing practices." Barens attached a September 25, 2017 letter from Dr. Grant R. Fairbanks to Dr. Calvert regarding West. Dr. Fairbanks wrote he had consulted with West in September 2017 regarding her chronic nasal infection. Dr. Fairbanks had previously treated West in 2009 to remove pieces of a nasal implant. West told Dr. Fairbanks that Dr. Calvert had put Gore-Tex spacers in her nose. But Dr. Fairbanks did not find any reference to Gore-Tex in West's medical file, and he told her he did not believe Dr. Calvert would put Gore-Tex in her nose. Dr. Fairbanks declined to take West as a patient because of West's "past history of noncompliance" in failing to undergo additional surgeries Dr. Fairbanks had recommended.

On May 10, 2019 Barens wrote to Leighton and KTTV investigative reporter and anchor Melugin, stating, "For

5

approximately the past three (3) weeks I have received dozens and dozens of calls from Mr. Leighton asking questions regarding my client Dr. Calvert in conjunction with your subject Natalie West . . . ." Barens wrote West's claims were "unsupportable," "objectively disprovable," and "based on fantasy and fiction." Barens asserted as to West's allegations of forcible sexual penetration, "The utter absurdity of this allegation should cause concern and hesitation to any reputable, legitimate news agency . . . ." Barens urged Leighton and Melugin not to quote "the rantings of an obviously disturbed individual."

On May 13, 2019 Barens again wrote to Leighton and Melugin, stating "West signed [c]onsents for each and every procedure/surgery that [Dr. Calvert] provided" and all insurance billings were "consistently and comprehensively authorized by Ms. West." Barens referred to West as "a woman whose credibility is totally suspect as evidenced by the fantasy allegations of sexual penetration by a foreign object as referenced in her complaint." Barens further denied any "resident or attending surgeons from USC ever performed any procedure on Ms. West."

### 3. *The May 13, 2019 Report*

On May 13, 2019 KTTV broadcast a news report on West's allegations of fraud and medical battery against Dr. Calvert. Melugin opened the segment, "[T]he Beverly Hills plastic surgeon we've been investigating is widely considered to be one of the top [plastic] surgeons in the entire country. . . . But some of his former patients alleged there's another side of this doctor that you need to know about." Melugin identified West as "[a] patient in pain taking legal action after accusations of unconsented,

6

unnecessary, and damaging surgical procedures." Melugin reported West's "allegations" that Dr. Calvert performed unnecessary and harmful nasal surgeries on West and double billed West and her insurer; he falsely characterized the surgeries as medically necessary for nasal airway obstructions; and he allowed a USC medical fellow to perform a surgery on West without West's consent. The report included excerpts from a pre-recorded interview with West and her attorney Leslie Hakala, in which each made statements regarding West's allegations. At several points during the report, descriptions of West's allegations by Melugin, West, or Hakala were accompanied by background graphics showing related portions of West's second amended complaint against Dr. Calvert.

Melugin reported Dr. Calvert declined to be interviewed for the segment, but Melugin included Barens's statement denying the allegations: "'Every procedure performed by Dr. Calvert on every patient was consented to in writing prior to the procedure by the respective patient. Dr. Calvert has never allowed or permitted any resident or fellow to perform surgery on his patients which is verified by patient medical records. This case will be vigorously defended and ultimately rejected by the court.'"

The report also included excerpts from a pre-recorded interview with Houston. Melugin identified Houston as a former patient who was not a party to West's lawsuit. Houston stated Dr. Calvert falsely claimed in a surgical report that the cosmetic nasal surgery he performed on Houston was necessary to correct a nasal airway obstruction caused by an accident in which Houston dropped a box on his face. Houston denied the injury, explaining he simply "didn't like the way [his] nose looked." Houston alleged Dr. Calvert had similarly mischaracterized other

7

cosmetic surgeries so he could bill Houston's insurer for the procedures. Further, Houston was afraid of Dr. Calvert because when Houston confronted him about his billing practices, Dr. Calvert threatened Houston, stating, "[I]f I go down for insurance fraud I'm taking you with me." Melugin added at the end of the report, "Calvert's attorney declined to respond to Houston's allegations when asked for a comment by [KTTV]."

Melugin also stated USC sponsored a plastic surgery fellowship program run by Dr. Calvert, in which USC residents and fellows received training from Dr. Calvert. Melugin reported Dr. Calvert identified himself on his social media profile as a clinical associate professor at USC's Keck School of Medicine, and Dr. Calvert's name appeared as a faculty surgeon on USC's website. Melugin added that in a statement to KTTV, USC "appeared to distance [itself] from Dr. Calvert" by clarifying Dr. Calvert is not an associate professor or regular staff member of USC, but rather is "'a voluntary faculty member'" who was not employed or paid by USC. Moreover, although fellows received access to the medical school's online library and academic lectures, according to USC, "[F]ellows in this program are not associated with the University."

Melugin reported further that in 2013 the Orange County District Attorney filed felony charges against Dr. Calvert, alleging Dr. Calvert "fabricat[ed] documents and perform[ed] unnecessary surgery as part of an insurance fraud scheme." Melugin stated the charges were dropped in 2014, but deputy district attorney Shaddi Kamiabipour was quoted in an interview with the Orange County Register as saying the charges were not dismissed based on Dr. Calvert's innocence, but rather, because the fraud appeared to be "a reasonably isolated incident."

Melugin reported the Orange County district attorney's office in a statement stood by Kamiabipour's prior comment that "Calvert was not innocent."

KTTV published a written version of the report on its website.

4. *The May 15, 2019 Report*

On May 15, 2019 KTTV broadcast a second news report on West's allegations against Dr. Calvert. Melugin reported, "A lot of new details [are] coming out after our investigation into Dr. Jay Calvert first aired on Monday night." Melugin reported USC had "removed all affiliation with [Dr. Calvert] off of their plastic surgery website." Melugin stated Hakala held a press conference that day, in which she indicated more than 20 "new alleged victims" had contacted her to make similar allegations of insurance fraud and unnecessary surgeries. In footage of the press conference, Hakala opined USC would not have been in "a huge rush" to distance itself from Dr. Calvert if USC had full confidence in him.

Melugin repeated Barens's earlier statement denying the allegations. KTTV published a written version of the report on its website.

5. *Dr. Calvert's demand for retraction*

On May 30, 2018 Neville L. Johnson, attorney for Dr. Calvert, sent a letter to Melugin, KTTV news director Kris Knutsen, and the Fox legal department demanding retraction of the May 13 and 15 reports and accompanying online articles. Johnson objected to the "entire broadcasts" as "false" and "grossly libelous and slanderous" of Dr. Calvert. Johnson identified as

false the reports' statements Dr. Calvert defrauded West's and Houston's insurers, performed unnecessary procedures or made false diagnoses to justify surgeries as medically necessary, and allowed USC fellows to operate on West.[5]

Johnson asserted Houston "made identical allegations to the Medical Board of California, which rejected them in their entirety." Johnson also objected to the reference in the May 13 report to the criminal charges against Dr. Calvert that had been filed and later dismissed by the Orange County District Attorney.

The Fox defendants made no retraction.

B.    *Dr. Calvert's Complaint Against the Fox Defendants and Houston*

On June 9, 2020 the Calvert plaintiffs filed a complaint against the Fox defendants and Houston, alleging a single cause of action for libel. The complaint alleged 60 statements made in the May 13 and 15 reports were "[f]alse [a]ccusations." The statements included that Dr. Calvert engaged in insurance fraud, prescribed unnecessary surgeries, committed medical malpractice, threatened patients, allowed USC students to perform surgeries on his behalf, and misrepresented his relationship with USC. The statements were defamatory, and the Fox defendants and Houston published them "with negligence and with actual malice, defined as knowledge of falsity or reckless disregard for truth or falsity." The complaint further alleged Houston and the Fox defendants were aware of Houston's complaint against Dr. Calvert to the Medical Board of California

---

[5]    In his letter, Johnson also disputed West's allegations of forcible sexual penetration, but those allegations were not discussed in the reports or articles.

(Medical Board) and the complaint "was defeated immediately, exonerating Dr. Calvert."

The complaint also alleged the Fox defendants "falsely communicated to viewers and readers that it had raised Houston's accusations . . . with Dr. Calvert and his attorneys, but that they had refused to respond to Fox's inquiries." Instead, the Fox defendants "deliberately hid from Dr. Calvert and his attorney the fact that Houston was making accusations to Fox about Dr. Calvert." The Fox defendants' omission "creat[ed] the false impression that Dr. Calvert and his attorney had refused to comment on Houston's accusations, [which] constituted knowing falsehood, and a conscious turning of a blind eye to evidence that would have refuted Houston's claims, all highly probative of actual malice." Further, the Fox defendants ignored "powerful evidence" of the falsity of West's claims that had been supplied by Dr. Calvert's attorneys. In addition, the Fox defendants led viewers to believe the report was based on Fox's own investigation.

C. *The Fox Defendants' and Houston's Special Motions To Strike*

In August and September 2020 the Fox defendants and Houston separately filed special motions to strike the complaint. They argued the Calvert plaintiffs' defamation claims arose from protected activity in furtherance of their free speech in connection with an issue of public interest. Further, the Calvert plaintiffs could not establish a probability of prevailing on their claims because the reports were protected by the fair report privilege under section 47, subdivision (d), and the statements were mere opinion, substantially true, or not defamatory.

11

Further, the Calvert plaintiffs failed to comply with section 48a's requirement that they timely demand a retraction, thereby limiting their recovery to special damages, which they had failed to plead. In addition, the Calvert plaintiffs failed adequately to plead the statements were made with actual malice, which was required based on Dr. Calvert's status as a public figure. All claims by the professional corporation failed because none of the allegedly defamatory statements concerned the corporation. Houston also argued the statements he made concerned West's lawsuit, the Orange County District Attorney's felony complaint, and Houston's Medical Board complaint, all of which were protected by the litigation privilege under section 47, subdivision (b).

The Fox defendants attached as exhibits to their motion copies of West's second amended complaint against Dr. Calvert and the felony complaint filed by the Orange County District Attorney. The Fox defendants also attached an article from the Orange County Register stating the felony charges against Dr. Calvert were dismissed, but quoting deputy district attorney Kamiabipour as saying, "'We're not dealing with a situation of me dismissing the case because he's innocent . . . .'" In the article, Kamiabipour explained the charges were dropped "because [Dr.] Calvert agreed to pay an undisclosed amount of restitution to patients" and "agreed to change some of his practices to ensure patients consent to all procedures and know what [Dr.] Calvert is billing."

In a declaration filed in support of his special motion to strike, Houston averred, "I filed a complaint against Calvert with the Medical Board of California because of the mistakes and possible malpractice related to the various jaw implants and

12

surgeries . . . . The complaint only had to do with my jaw implant surgeries and did not have to do with my other procedures or visits. The complaint also had nothing to do with Calvert's billing practices or allegations of fraud or other malpractice." Houston declared that he confronted Dr. Calvert about his billing practices in late 2018, after learning Dr. Calvert had billed Houston's insurer in connection with a cosmetic jaw implant procedure. In response, Dr. Calvert told Houston "that if he went down for insurance fraud, he would take [Houston] down with him so [Houston] shouldn't push the issue." Houston understood this as a threat to his "personal and financial safety." Houston continued, "I do not bear any ill-will towards Dr. Calvert in his personal or professional capacity or towards his company."

In their oppositions, the Calvert plaintiffs did not dispute that Dr. Calvert was a public figure, or that their claims arose from the defendants' protected activity in broadcasting information on an issue of public interest. Instead, the Calvert plaintiffs argued the fair report privilege did not apply; the statements were not substantially true; Johnson's retraction letter to the Fox defendants met the requirements of section 48a; section 48a did not apply to Houston; and Dr. Calvert met his burden to plead and prove actual malice as to the Fox defendants and Houston. As to 15 of the allegedly "false accusations" identified in the complaint, the Calvert plaintiffs asserted the statements were included only for context. The Calvert plaintiffs failed to respond to the argument the allegedly defamatory statement did not concern Dr. Calvert's professional corporation.

Dr. Calvert submitted declarations in support of the Calvert plaintiffs' oppositions. He attached to his declaration in opposition to the Fox defendants' motion portions of West's and

13

Houston's medical records, consent forms, insurance authorizations, and billing histories, which he asserted contradicted their allegations. Dr. Calvert also attached to both declarations copies of a February 8, 2017 letter from the Medical Board with the subject "Michael Jay Houston." The letter states, "Dear Dr. Calvert: [¶] This is to advise you the Medical Board of California has concluded its review of the complaint filed against you alleging you provided negligent treatment of the above-named patient. No further action is anticipated and the complaint file has been closed." Houston objected to admission of the February 8, 2017 letter as hearsay. Dr. Calvert averred in each declaration, "I never threatened Houston physically nor have I ever threatened him with criminal or civil liability or in late 2015 or any time regarding any alleged insurance fraud."

The Calvert plaintiffs requested judicial notice of the transcripts of the March 2 and May 18, 2020 depositions of West and the December 15, 2019 deposition of Dr. Fairbanks, which were taken as part of West's lawsuit against Dr. Calvert.

On February 1, 2021 the trial court denied the special motions to strike. In its written rulings, the trial court granted the Calvert plaintiffs' request for judicial notice of the West and Dr. Fairbanks deposition transcripts. The court overruled Houston's evidentiary objections to the Medical Board letter. The court declined to analyze and denied the motions to strike 13 of the statements characterized by the Calvert plaintiffs in their oppositions as nonactionable allegations made solely for context.

The trial court found the remaining 47 statements identified in the Calvert plaintiffs' complaint fell within the scope of Code of Civil Procedure section 425.16 because they "concerned a public figure and a matter of public interest." The court found

14

the fair report privilege did not apply to any of the statements. As to West's, Hakala's, and Melugin's statements regarding West's allegations against Dr. Calvert, the court found the statements did not directly reference West's civil complaint or purport solely to be allegations from the lawsuit. The court reasoned the statements "derived from an interview" and were "not attributed to any judicial or official proceeding," and therefore, the statements fell "outside of and expand the allegations" in West's complaint.

As to Houston's allegations against Dr. Calvert, the trial court found, "Houston is making his own independent accusations," which "are not a fair report of a judicial or official proceeding involving Mr. Houston." Further, Houston's statements were not protected by the litigation privilege because the statements were not made in any official proceeding and the privilege does not protect statements to the media. As to Melugin's reporting on the Orange County District Attorney's filing and dismissal of the criminal complaint against Dr. Calvert, the court found the statements were not protected by the fair report privilege because the post-dismissal comments did not "reflect the 'gist or sting'" of the criminal complaint or proceeding.

The trial court also found the Calvert plaintiffs adequately pleaded and proved actual malice. The court explained the pre-reporting letters from Barens to Leighton and Melugin showed the "story regarding West and Houston [was] 'worthy of doubt.'" The court also considered West's and Houston's medical records and Dr. Calvert's declaration in concluding, "Fox failed to sufficiently review pertinent medical and insurance records . . . before broadcasting and publishing its stories about Calvert." Further, the Fox defendants' reliance on biased sources (West

15

and Houston) evidenced their actual malice. The court found Melugin's statement during the May 13 report that "'Dr. Calvert's attorney declined to respond to Houston's allegations when asked for a comment by [KTTV],'" followed quickly by the statement "'it's not the first time that Calvert faced allegations of fraud,'" gave viewers the impression the accusations were true. In addition, the deposition testimony of West and Dr. Fairbanks supported Dr. Calvert's assertion "he did not put an 'unknown material' or Gore-Tex in Ms. West's nose." The court further relied on Dr. Fairbanks's deposition testimony that West did not receive inappropriate medical care and West's deposition testimony she was not harmed by Dr. Calvert billing her insurer.

As to Houston, the court found the Calvert plaintiffs had shown a probability they could produce clear and convincing evidence Houston made his statements regarding Dr. Calvert with actual malice. The court observed, "It is undisputed that Houston was not relying on information or claims by others, but rather unequivocally stated that he had first-hand experience with Dr. Calvert as to his allegations of misconduct, fraud and greed." The court further reasoned, "Plaintiffs presented sufficient admissible evidence demonstrating malice by showing that Houston did not truthfully quote Dr. Calvert."

The Fox defendants and Houston timely appealed.

## DISCUSSION

A.    *Special Motions To Strike*

A cause of action arising from an act in furtherance of a defendant's constitutional right of petition or free speech in connection with a public issue is subject to a special motion to strike unless the plaintiff demonstrates a probability of

16

prevailing on the claim. (Code of Civ. Proc., § 425.16, subd. (b)(1); see *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009 (*Bonni*); *Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788 (*Monster Energy*).) An "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue'" includes, in relevant part, "any . . . conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest." (Code Civ. Proc., § 425.16, subd. (e)(4).)

"Litigation of an anti-SLAPP motion involves a two-step process. First, 'the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.' [Citation.] Second, for each claim that does arise from protected activity, the plaintiff must show the claim has 'at least "minimal merit."' [Citation.] If the plaintiff cannot make this showing, the court will strike the claim." (*Bonni, supra*, 11 Cal.5th at p. 1009; accord, *Monster Energy, supra*, 7 Cal.5th at p. 788.)

As part of the second step, we apply a ""summary-judgment-like procedure." [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] "[C]laims with the requisite minimal merit may proceed.""" (*Sweetwater Union High School Dist. v. Gilbane Building*

*Co.* (2019) 6 Cal.5th 931, 940 (*Sweetwater*); accord, *Taus v. Loftus* (2007) 40 Cal.4th 683, 713-714 (*Taus*).)

"[A]t the second stage of an anti-SLAPP hearing, the court may consider affidavits, declarations, and their equivalents if it is reasonably possible the proffered evidence set out in those statements will be admissible at trial. Conversely, if the evidence relied upon *cannot* be admitted at trial, because it is categorically barred or undisputed factual circumstances show inadmissibility, the court may not consider it in the face of an objection. If an evidentiary objection is made, the plaintiff may attempt to cure the asserted defect or demonstrate the defect is curable." (*Sweetwater, supra*, 6 Cal.5th at p. 949.)

"We review de novo the grant or denial of an anti-SLAPP motion." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067; accord, *Monster Energy, supra*, 7 Cal.5th at p. 788.)


B.     *Defendants Carried Their Burden To Show Most of Their Claims Arose from Defendants' Protected Activity*

The Calvert plaintiffs do not dispute that the Fox defendants and Houston carried their burdens to show the complaint's defamation claims arose from the defendants' protected activity. We agree as to most of the challenged allegations. However, "[a]llegations of protected activity that merely provide context without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 394 (*Baral*); accord, *Bonni, supra*, 11 Cal.5th at p. 1012.) Therefore, the complaint's allegations of protected activity that provide only context for the Calvert plaintiffs' defamation claims must be disregarded for purposes of

18

the anti-SLAPP analysis (complaint ¶¶ 36, 38, 41-42, 46-47, 54, 60, 66, 68, 70, 72-74, 80). We proceed to analyze whether the Calvert plaintiffs carried their burden to show a probability of prevailing on their claims.

C. *The Law of Defamation*

The elements of a defamation claim are "'"(a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage."'" (*Taus, supra*, 40 Cal.4th at p. 720; accord, *Murray v. Tran* (2020) 55 Cal.App.5th 10, 37.) Additionally, "a libel plaintiff who is a public figure must prove, by clear and convincing evidence, that the defendant made the libelous statement with '"actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'" (*Edward v. Ellis* (2021) 72 Cal.App.5th 780, 793 (*Edward*); accord, *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 256; *Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1260 (*Jackson*).)

Libel, a form of defamation (§ 44, subd. (a)), "is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (*Id.*, § 45.) "In determining whether a statement is libelous we look to what is explicitly stated as well as what insinuation and implication can be reasonably drawn from the communication." (*Forsher v. Bugliosi* (1980) 26 Cal.3d 792, 803; accord, *Issa v. Applegate* (2019) 31 Cal.App.5th 689, 703.) "[T]he expression used as well as the 'whole scope and apparent object of the writer' must be considered." (*Forsher*, at p. 803; accord, *Wong*

19

*v. Jing* (2010) 189 Cal.App.4th 1354, 1373.)  "[E]ach assertion of a defamatory statement represents a specific act that could, on its own, give rise to a claim for relief."  (*Medical Marijuana, Inc. v. ProjectCBD.com* (2020) 46 Cal.App.5th 869, 886, fn. 11.)

D.     *The Professional Corporation Failed To Carry Its Burden To Show a Probability of Prevailing on Its Claims Because None of the Challenged Statements Concerned the Professional Corporation*

The Fox defendants and Houston contend none of the allegedly defamatory statements concerned the professional corporation.  The Calvert plaintiffs make no argument to the contrary.

"In defamation actions the First Amendment . . . requires that the statement on which the claim is based must specifically refer to, or be 'of and concerning,' the plaintiff in some way." (*Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042; accord, *Dickinson v. Cosby* (2019) 37 Cal.App.5th 1138, 1160 ["'The "of and concerning" or specific reference requirement limits the right of action for injurious falsehood, granting it to those who are the direct object of criticism and denying it to those who merely complain of nonspecific statements that they believe cause them some hurt.'"]; *Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1405 [statements by defendant that were not directed at plaintiff are not actionable].)  None of the statements challenged in the complaint refers to the professional corporation.  The May 13 report identified Dr. Calvert as the chief executive officer and president of the entity "Calvert M.D. Incorporated," which the report indicated billed West's insurer $32,000 in connection with West's first nasal surgery performed

20

by Dr. Calvert, but the Calvert plaintiffs do not contend this single reference to the professional corporation is actionable.

Because the professional corporation failed to carry its burden to show any of the allegedly defamatory statements concerned it, the trial court erred in denying the Fox defendants' and Houston's special motions to strike the defamation claims brought by the professional corporation.

E.    *The Trial Court Erred in Denying the Fox Defendants' Special Motion To Strike the Complaint as to Dr. Calvert's Claims*

1.    *Dr. Calvert failed to show the challenged statements regarding USC were not substantially true*

Among the 60 statements identified in the complaint as false accusations, nine by Melugin related to Dr. Calvert's relationship with USC.[6]  In their oppositions, the Calvert plaintiffs argued three of these statements were actionable (complaint ¶¶ 67, 69, 75), with the remaining six statements providing context for the actionable statements (*id.* ¶¶ 66, 68, 70, 72-74).  On appeal, the Fox defendants argue Dr. Calvert cannot prevail on his claims based on the three remaining statements because they are not materially false.  Rather, the statements "correctly relayed USC's position that Calvert inaccurately

---

[6]    The complaint also identified as a false accusation the statement by Hakala, "If [USC] didn't have anything to hide and [USC] had full confidence in [Dr.] Calvert, [USC] wouldn't have been in a huge rush to distance [itself] so completely from him." As we will discuss, Fox's reporting of Hakala's comments made at the press conference regarding West's civil complaint are protected by the fair report privilege.

21

described their affiliation, and that USC subsequently removed him from the school's plastic surgery website."

A plaintiff must prove the allegedly defamatory statements are not substantially true. (*Taus, supra*, 40 Cal.4th at p. 720; accord, *Murray v. Tran, supra*, 55 Cal.App.5th at p. 37; *Jackson, supra*, 10 Cal.App.5th at p. 1262.) Dr. Calvert submitted no evidence in opposition to the Fox defendants' special motion to strike to show Melugin's statements regarding USC were not substantially true. He has therefore failed to carry his burden to show a probability of success on his defamation claims based on these statements. (*Monster Energy, supra*, 7 Cal.5th at p. 788 ["[A] plaintiff seeking to demonstrate the merit of the claim 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.'"].)

As to the six statements included for context, although they must be initially disregarded as part of the anti-SLAPP analysis because they merely provide context for the three statements that should have been stricken, the trial court erred in failing to grant the Fox defendants' special motion to strike as to all nine statements (complaint ¶¶ 66-70, 72-75). (*Baral, supra*, 1 Cal.5th at p. 396 [as part of the prong 2 analysis, "[a]llegations of protected activity supporting the stricken claim are eliminated from the complaint, unless they also support a distinct claim on which the plaintiff has shown a probability of prevailing"].)

22

2. *The trial court erred in failing to apply the fair report privilege to the Fox defendants' reporting on West's allegations against Dr. Calvert, but the privilege does not protect Houston's allegations*

(a) *The fair report privilege*

"Civil Code section 47, subdivision (d) confers an absolute privilege on any fair and true report in, or a communication to, a public journal of a judicial proceeding, or anything said in the course thereof." (*Sipple v. Foundation For Nat. Progress* (1999) 71 Cal.App.4th 226, 240 (*Sipple*); accord, *Healthsmart Pacific, Inc. v. Kabateck* (2016) 7 Cal.App.5th 416, 431 (*Healthsmart*) ["When [the fair report privilege] applies, the reported statements are 'absolutely privileged regardless of the defendants' motive for reporting' them."].) "'Fair and true' in this context does not refer to the truth or accuracy of the matters asserted in the judicial proceedings, but rather to the accuracy of the challenged statements with respect to what occurred in the judicial proceedings." (*Healthsmart*, at p. 434; accord, *McClatchy Newspapers, Inc. v. Superior Court* (1987) 189 Cal.App.3d 961, 975.)

"'[A] media defendant does not have to justify every word of the alleged defamatory material that is published. [Citation.] The media's responsibility lies in ensuring that the "gist or sting" of the report—its very substance—is accurately conveyed. [Citation.] Moreover, this responsibility carries with it a certain amount of literary license. The reporter is not bound by the straitjacket of the testifier's exact words; a degree of flexibility is tolerated in deciding what is a "fair report."'" (*Sipple, supra*, 71 Cal.App.4th at p. 242; accord, *Reader's Digest Assn. v. Superior Court, supra*, 37 Cal.3d at p. 262, fn. 13 ["'It is well

23

settled that a defendant is not required in an action of libel to justify every word of the alleged defamatory matter; it is sufficient if the substance, the gist, the sting of the libelous charge be justified."""]; *J-M Manufacturing Co., Inc. v. Phillips & Cohen LLP* (2016) 247 Cal.App.4th 87, 99-100 (*J-M Manufacturing*) ["the defendant is 'permit[ted] a certain degree of flexibility/literary license': """"If the substantial imputations be proved true, a slight inaccuracy in the details will not prevent a judgment for the defendant, if the inaccuracy does not change the complexion of the affair so as to affect the reader of the article differently than the actual truth would.""""]; *Balzaga v. Fox News Network, LLC* (2009) 173 Cal.App.4th 1325, 1337 ["The privilege applies if the substance of the publication or broadcast captures the gist or sting of the statements made in the official proceedings."].)

The accuracy of the challenged statements with respect to what occurred in the judicial proceedings "is measured by the natural and probable effect the statements would have on the average person reading, viewing, or listening to the report." (*Healthsmart, supra*, 7 Cal.App.5th at p. 434; accord, *Kilgore v. Younger* (1982) 30 Cal.3d 770, 777; *J-M Manufacturing, supra*, 247 Cal.App.4th at p. 100.) "Courts have construed the privilege broadly, 'mindful of the Legislature's intent . . . "to preserve the scarce resources of California's courts [and] to avoid using the courts for satellite litigation.""" (*Healthsmart, supra*, 7 Cal.App.5th at p. 431; accord, *J-M Manufacturing, supra*, 247 Cal.App.4th at p. 101; *Sipple, supra*, 71 Cal.App.4th at p. 240 ["courts have construed Civil Code section 47, subdivision (d) broadly"].) Further, "California courts have construed the phrase, 'judicial proceeding,' broadly to include the filing of a

24

complaint. [Citations.] Thus, fair and true communications to the news media about allegations in a complaint are covered by the privilege." (*Healthsmart*, at p. 432.)

"In general, whether a privileged occasion exists within the meaning of Civil Code section 47, subdivision (d), is for the court to decide; whether the report of the official proceedings itself is "fair and true," provided reasonable minds could disagree as to the effect of the communication on the average reader or listener, is a question of fact for the jury. (*J-M Manufacturing, supra*, 247 Cal.App.4th at p. 98.) However, as we explained in *J-M Manufacturing*, "[a]lthough determining whether a communication is privileged under Civil Code section 47, subdivision (d), may properly be left to a jury in some instances, appellate courts have not been reluctant to decide the fair report privilege applies as a matter of law when the undisputed facts are insufficient to support a judgment for the plaintiff." (*Id*. at p. 99; see *Healthsmart*, at p. 431 ["When . . . 'there is no dispute as to what occurred in the judicial proceeding reported upon or as to what was contained in the report,' the question is one of law."]; *Kilgore v. Younger, supra*, 30 Cal.3d at page 777.)

In *J-M Manufacturing, supra*, 247 Cal.App.4th at page 91, for example, we reversed the trial court's denial of the defendant's special motion to strike claims for defamation and trade libel where the trial court had found it was a question of fact for the jury whether the press release at issue was privileged as a fair and true report of a judicial proceeding under section 47, subdivision (d). We concluded the defendant's press release following a jury trial was, as a matter of law, a fair and true report of the jury verdicts finding J-M Manufacturing had knowingly misrepresented to the plaintiff's clients that J-M

25

Manufacturing's pipe had been manufactured and tested in a manner assuring the pipe had the strength and durability required by industry standards. (*Id*. at pp. 91, 105; see *Kilgore v. Younger, supra*, 30 Cal.3d at page 777 [holding fair and true report privilege applied as a matter of law where average reader would not have read two newspaper articles discussing a report by the Attorney General that listed 92 individuals who were suspected of involvement in a wide variety of organized criminal activities as meaning the plaintiff was involved in every listed type of organized criminal activity, as opposed to the one crime of which he had been convicted].) In this case, as in *Kilgore* and *J-M Manufacturing*, we decide as a matter of law whether the undisputed statements in the two broadcasts constituted fair reports of the allegations in West's second amended complaint.

Although the plaintiff bears the burden at the second step of the anti-SLAPP analysis to show a probability of prevailing on his or her claims, "the defendant bears the burden of proving the privilege's applicability." (*Neurelis, Inc. v. Aquestive Therapeutics, Inc.* (2021) 71 Cal.App.5th 769, 794; accord, *Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 278.)

> (b) *The fair report privilege protects most of the challenged statements by West, Hakala, and Melugin regarding West's allegations against Dr. Calvert*

The Fox defendants contend Dr. Calvert cannot establish a probability of prevailing on his defamation claims because the reports are absolutely privileged as fair and true reports of a judicial proceeding to a public journal (§ 47, subd. (d)(1)). We agree most of the statements made by Melugin, West, and

26

Hakala pertaining to West's second amended complaint are privileged.

Dr. Calvert contends the trial court correctly found the challenged statements were not protected by the fair report privilege because they were not sufficiently attributed to West's lawsuit in the reports. We have reviewed videos of the two news reports, and both broadcasts clearly identified West's lawsuit as the subject of the report and the source of West's allegations. At the outset of the May 13 report, Melugin identified West as "[a] patient . . . taking legal action" and described West's allegations while a background graphic showed the caption page of the second amended complaint against Dr. Calvert. The report later specified West had sued Dr. Calvert and USC, and her second amended complaint alleged causes of action for fraud and medical battery. Further, the report on multiple occasions identified the assertions made by West and Hakala as allegations or referred directly to West's lawsuit.

Likewise, in the opening moments of the May 15 report on West's and Hakala's statements at the press conference, Melugin stated, "As we reported, West is suing Beverly Hills plastic surgeon Dr. Jay Calvert and USC for fraud and medical battery after she accuses Calvert of performing unnecessary and damaging procedures on her as part of an insurance fraud scheme." Thus, both reports clearly identify West's lawsuit as the source of West's allegations. (See *Healthsmart, supra*, 7 Cal.App.5th at p. 436 [where reporter identified plaintiff's attorney near the outset of report and frequently referenced the lawsuit with background images showing the complaint, the average viewer would understand the attorney's statements referred to lawsuit's allegations].)

27

Nor do statements by Melugin referring to the Fox defendants' "investigations" of Dr. Calvert remove the challenged statements from the protection of the fair report privilege. In context, a reasonable viewer would not understand the references to investigations to mean the Fox defendants were adopting or endorsing West's allegations as their own or making an independent assessments of Dr. Calvert's wrongdoing. Rather, the Fox defendants' investigation is more naturally understood as the aggregation of allegations against Dr. Calvert from several sources, including West and Hakala, Houston, the Orange County district attorney's office, and USC. Further, the reports clearly attribute each set of allegations to its source.

The Calvert plaintiffs also argue, as the trial court found, the interviews and press conferences on which the broadcasts were based do not qualify for protection under the fair report privilege. The law is to the contrary. The Courts of Appeal have consistently held statements to the press regarding pending litigation in the form of interviews and press releases fall within the privilege. (See *Argentieri v. Zuckerberg* (2017) 8 Cal.App.5th 768, 790 [attorney's email to members of the press that fairly described the allegations in malicious prosecution complaint was protected by the fair report privilege]; *Healthsmart, supra*, 7 Cal.App.5th at p. 432 [attorneys' statements on television and radio about allegations in complaint were fair and true communications to the news media covered by the privilege]; *J-M Manufacturing, supra*, 247 Cal.App.4th at p. 105 [fair report privilege protected law firm's posttrial press release that contained "self-promotion and puffery" but fell "comfortably within the permissible degree of flexibility and literary license afforded communications to the media concerning judicial

proceedings"]; *Sipple, supra*, 71 Cal.App.4th at pp. 245-246 [news article was a fair and true report on custody proceedings supported by court testimony, deposition testimony, and interviews with the parties and their supporters].)  Thus, the statements made by West and Hakala in interviews and press conferences included in the May 13 and 15 reports are protected by the privilege, as long as the statements accurately convey the gist and sting of West's allegations in the second amended complaint.

The Calvert plaintiffs contend the statements made by West, Hakala, and Melugin from the interviews and press conference went beyond the gist and the sting of the allegations in West's second amended complaint.  However, the challenged statements closely track the second amended complaint's allegations.  For example, West's statement "[i]t's just like my insurance was [Dr. Calvert's] personal ATM card" is a near verbatim quote from West's second amended complaint.  The Calvert plaintiffs assert the trial court found West's statement came "after Fox state[d] that it reviewed documents, insurance statements, billings records and records from the State of California that were provided to them by West."  But the May 13 report properly attributed West's statement to her second amended complaint:  Less than a minute before West made the challenged statement, Melugin stated, "[A]ccording to [West's] lawsuit, she discovered Calvert had fraudulently billed her insurance over five hundred and twenty thousand dollars and fraudulently collected over three hundred and thirty thousand dollars."  Thus, it is clear in context that West's statement refers to her allegations of insurance fraud against Dr. Calvert.

29

The Calvert plaintiffs similarly contend the trial court properly found the statement "West told [KTTV] she was flabbergasted after she says Dr. Calvert's front desk told her a USC fellow did one of her surgeries instead of Dr. Calvert" was not protected by the fair report privilege because the statement was not "prefaced as [an] allegation in the West Complaint" or "attributed to any judicial or official proceeding," and instead was "derived from an interview." However, considering the May 13 report as a whole, it would be clear to the average viewer the statement related to the allegations in West's second amended complaint that Dr. Calvert committed medical battery by having USC fellows perform surgeries on West without her consent. The fact West was surprised to learn someone performed the surgery other than Dr. Calvert simply underscores her allegation she did not consent to the procedure, and it does not alter the gist or sting of West's allegation that a USC fellow performed the surgery on her without her consent.

The Calvert plaintiffs also contend the trial court correctly found the privilege did not apply to the statement in the online article accompanying the May 13 report that "West provided [KTTV] with the prescription for her painkillers after the surgery, showing they were prescribed by the USC fellow, instead of Dr. Calvert," because West did not allege the USC fellows improperly wrote prescriptions for her. Although Melugin's report did not identify the USC fellow, the second amended complaint alleged that defendant Ziyad Hammoudeh, M.D., was one of two USC surgical fellows who worked in Dr. Calvert's fellowship program and performed a surgical procedure on West to which she had not consented. In support of this allegation, West alleged she found a pain medication that Dr. Hammoudeh

30

had prescribed to her following one of her surgeries. Thus, Melugin's statement about the pain medication both related to the allegations in the second amended complaint and did not alter the gist or sting of the allegations of nonconsensual surgery.

In short, the reports' statements relating to West's allegations and the interviews with West and Hakala may have "expanded on the theme but did not otherwise alter the substance of the privileged material such that a reader would be affected differently if the information garnered by interviews [with West and Hakala] were not included." (*Sipple, supra*, 71 Cal.App.4th at p. 245.)[7]

Thus, the trial court erred in failing to grant the Fox defendants' special motion to strike as to these statements in the

---

[7] It is a closer call whether the references in the May 15 report to Hakala's statements at the press conference regarding additional victims falls within the fair and true report privilege. Melugin reported that "according to the plaintiff's attorney in a press conference this afternoon, they've had over twenty new alleged victims contact them, . . . making similar accusations against the doctor about unnecessary surgeries and insurance fraud . . . ." Melguin further reported, "West says . . . new alleged victims are contacting her attorneys." The trial court found these statements did not recite or reflect allegations in West's second amended complaint. Arguably the statements do not alter the gist or sting of West's allegations that Dr. Calvert engaged in "an orchestrated scheme of insurance fraud" affecting not just West, but also Dr. Calvert's other patients. However, because we conclude below that Dr. Calvert did not show actual malice as to the Fox defendants, we do not reach whether the statements fall within the fair report privilege.

31

complaint (complaint ¶¶ 23-36, 50-51, 56-59, 62, 76, 79-80, 82-83).[8]

> ### (c) *The fair report privilege does not protect the statements by Melugin and Houston regarding Houston's allegations against Dr. Calvert*[9]

Unlike West's allegations, Houston's allegations do not relate to and are not attributed to any judicial proceeding protected under section 47, subdivision (d). The Fox defendants acknowledge Houston is not identified as a patient of Dr. Calvert in West's second amended complaint, but they contend Houston's statements "expanded on the specific allegations in the West Lawsuit" without "alter[ing] their gist and sting." Although Houston's allegations of insurance fraud by Dr. Calvert tend to corroborate some of West's allegations, Houston's statements involve separate and distinct instances of asserted malfeasance by Dr. Calvert.

The Fox defendants rely on *Sipple, supra*, 71 Cal.App.4th 226 and *Dorsey v. National Enquirer, Inc.* (9th Cir. 1992)

---

[8] As to the statements alleged in the complaint for context regarding West's allegations, because they merely provide context for the statements that should have been stricken, the trial court erred in failing to grant the Fox defendants' special motion to strike as to the context allegations (complaint ¶¶ 36, 80). (*Baral, supra*, 1 Cal.5th at p. 396.)

[9] We discuss these allegations with respect to the Calvert plaintiffs' separate claims against the Fox defendants and Houston. However, as we discuss below, Dr. Calvert met his burden to present evidence of actual malice as to Houston, but not as to the Fox defendants.

32

973 F.2d 1431, but both are distinguishable.  In *Sipple*, Mother Jones magazine published an article reporting on a custody dispute between a nationally known political consultant and his first wife.  In the custody dispute, the consultant's first and second wives each testified to suffering physical and emotional abuse by the consultant.  (*Sipple*, at pp. 230-231.)  To prepare the article, the author reviewed testimony from the hearing and the first wife's deposition in the custody case, and he interviewed the women and their friends and relatives to confirm the women's stories.  (*Id.* at pp. 232-233.)  The Court of Appeal concluded the fair report privilege protected the article, rejecting the consultant's argument that statements in the article were not included in the court proceedings, and thus received no protection.  (*Id.* at p. 245.)  The court reasoned, "[A]lthough [the article] expands on specific incidents of abuse, [it] does not change the gist or sting of the courtroom statements or the complexion of the affair." (*Ibid*.)  The Fox defendants attempt to analogize their interview with Houston to the author's interviews with the women and their friends and relatives.  But the interviews in *Sipple* related to the abuse the women in the custody proceeding testified about, whereas Houston's interview included only his own allegations against Dr. Calvert.

In *Dorsey*, a famous singer sued the National Enquirer for defamation based on an article it published that reported on a parentage suit in which the mother of the singer's child claimed the singer suffered from the AIDS virus.  (*Dorsey v. National Enquirer, Inc., supra*, 973 F.2d at p. 1433.)  The article quoted the mother and a private investigator she hired as asserting great confidence in the allegation.  (*Ibid*.)  Applying California law, the Ninth Circuit concluded the fair report privilege

33

protected the mother's and investigator's out-of-court statements where the statements "merely confirm[ed] the gist" of the mother's statement in the lawsuit "'on information and belief'" that the singer had the AIDS virus. (*Id.* at pp. 1436-1437.) Here, Houston's interview does not merely confirm the gist of West's allegations, but rather, he provided new allegations of alleged misconduct by Dr. Calvert in his treatment of Houston.

> 3. *The trial court erred in finding as to the remaining statements by Melugin that Dr. Calvert showed a probability he can produce clear and convincing evidence of the Fox defendants' actual malice*

Dr. Calvert does not dispute he is a public figure and therefore must prove the Fox defendants published the challenged statements with actual malice. "Although at trial a public figure plaintiff must establish actual malice by clear and convincing evidence, in the context of an anti-SLAPP motion the plaintiff must instead establish only a 'probability' that he or she can produce clear and convincing evidence of actual malice." (*Edward, supra,* 72 Cal.App.5th at p. 793; accord, *Ampex Corp. v. Cargle,* 128 Cal.App.4th 1569, 1578.) Dr. Calvert has not met this burden.[10]

---

[10] The Fox defendants contend the Calvert plaintiffs failed adequately to plead in the complaint that the Fox defendants acted with actual malice, citing to *Vogel v. Felice* (2005) 127 Cal.App.4th 1006, 1017. Because we find the Calvert plaintiffs did not meet their burden to show a probability of proving actual malice as to the Fox defendants, we need not reach this contention. We discuss this argument as to Houston below.

The actual malice standard "focuses solely on the defendant's subjective state of mind at the time of publication." (*Sutter Health v. UNITE HERE* (2010) 186 Cal.App.4th 1193, 1210; accord, *Bose Corp. v. Consumers Union of United States, Inc.* (1984) 466 U.S. 485, 512 [post-publication, incredible explanation for inaccuracy by author of report did "not establish that he realized the inaccuracy at the time of publication"]; *Khawar v. Globe Int'l., Inc.* (1998) 19 Cal.4th 254, 262 ["[T]he publisher of a defamatory statement acts with reckless disregard amounting to actual malice if, at the time of publication, the publisher 'in fact entertained serious doubts as to the truth of his publication.'"].) "'[A]ctual malice can be proved by circumstantial evidence.' [Citation.] Considerations such as 'anger and hostility toward the plaintiff,' 'reliance upon sources known to be unreliable [citations] or known to be biased against the plaintiff,' and 'failure to investigate' may, 'in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication.' [Citation.] Such evidence is relevant 'to the extent that it reflects on the subjective attitude of the publisher' . . . ." (*Balla v. Hall* (2021) 59 Cal.App.5th 652, 683; accord, *Edward, supra*, 72 Cal.App.5th at p. 793.) "However, 'failure to investigate, without more, generally is insufficient' to show malice. [Citation.] And 'we will not infer actual malice solely from evidence of ill will, personal spite or bad motive.'" (*Edward*, at p. 793; accord, *Ampex Corp. v. Cargle, supra*, 128 Cal.App.4th at p. 1579.)

Further, "'the press need not accept [a defendant's] "denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the

35

likelihood of error." [Citation.]' [Citation.] 'A denial only serves to buttress a case for actual malice when there is something in the content of the denial or supporting evidence produced in conjunction with the denial that carries a doubt-inducing quality.'" (*Young v. CBS Broadcasting, Inc.* (2012) 212 Cal.App.4th 551, 564; accord, *Harte-Hanks Communications, Inc. v. Connaughton* (1989) 491 U.S. 657, 691, fn. 37.)

With respect to Melugin's statements regarding the Orange County District Attorney's filing and later dismissal of felony charges against Dr. Calvert based on alleged insurance fraud, Dr. Calvert submitted no evidence Melugin (or the other Fox defendants) acted with actual malice in describing statements made by deputy district attorney Kamiabipour or other representatives of the district attorney's office. Although Dr. Calvert averred in his declaration he "never committed . . . criminal insurance fraud regarding any patient" and he was "never proven guilty by the Orange County District Attorney's office," he has not provided any evidence to support his claim the Fox defendants knew Kamiabipour's statements in the May 13 report as to why the criminal complaint was dismissed were false, or that the Fox defendants entertained serious doubt the statements were truthful at the time of publication. Further, Dr. Calvert presents no argument on appeal that these statements were made with actual malice. Thus, the trial court erred in failing to grant the Fox defendants' special motion to strike these statements (complaint ¶¶ 46-49).[11]

---

[11] As to the statements alleged in the complaint for context regarding the criminal complaint, because they merely provide context for the statements that should have been stricken, the

Dr. Calvert also argues the Fox defendants ignored strong evidence of the falsity of West's claims, including the deposition testimony of West and Dr. Fairbanks, as well as medical and insurance documentation submitted in opposition to the special motions to strike. The trial court erred in considering this evidence. The deposition transcripts were provided to the court in November 2020 with the Calvert plaintiffs' oppositions to the motions. There is no evidence in the record showing the documents were available to the Fox defendants prior to the time of publication (in May 2019). Likewise, Dr. Calvert stated in his November 19, 2020 declaration that West had consented to the surgeries and the surgeries were medically necessary, and he attached medical and insurance documentation to support his assertions, but the declaration was filed in the court only after the 2019 broadcasts. There is no evidence in the record that the Calvert plaintiffs provided this information to the Fox defendants prior to the broadcast. The deposition testimony and Calvert's declaration and attached documents are therefore irrelevant to the Fox defendants' subjective mental state at the time the reports were published. (See *Sutter Health v. UNITE HERE, supra*, 186 Cal.App.4th at p. 1210.)

Dr. Calvert further relies on Barens's April 25, May 10, and May 13, 2019 pre-publication letters to Leighton and Melugin to show actual malice, but these letters simply deny any wrongdoing and state repeatedly without supporting documentation that West consented to the surgeries and Dr. Calvert properly billed the insurance companies because the

---

trial court erred in failing to grant the Fox defendants' special motion to strike as to the context allegations (complaint ¶¶ 46-47). (*Baral, supra*, 1 Cal.5th at p. 396.)

surgeries were medically necessary. In his April 25 letter, Barens invited Leighton to review West's medical charts and billing records. However, in his May 13 letter, Barens repeated that West's allegations were "categorically untrue and can be disproven by written documentation," but stated he could not release West's medical records because West had refused to consent to disclosure. There is no evidence in the record that Barens ever provided to the Fox defendants any evidence to support Barens's conclusory statements that Dr. Calvert had committed no wrongdoing. Barens's May 10 letter similarly stated that West had consented both to the surgeries and the insurance billing. But the focus of Barens's May 10 letter was on the "utter absurdity" of West's claims of sexual penetration, which Barens relied on to argue West was not credible. There is nothing in the record to show West's allegation she was subjected to nonconsensual sexual penetration while unconscious during a surgery was false. Regardless, the Fox defendants elected not to report on these allegations by West, instead focusing on her claims for fraud and medical battery. Moreover, rather than demonstrating the Fox defendants intentionally avoided the truth, the May 10 letter acknowledges Barens had received "dozens and dozens of calls from Mr. Leighton asking questions" about Dr. Calvert's treatment of West. In light of the lack of any documentation to support Barens's denials of Dr. Calvert's wrongdoing, the Fox defendants were not required to accept Barens's denials as true. (See *Young v. CBS Broadcasting, Inc., supra*, 212 Cal.App.4th at p. 564.)

Likewise, the September 25, 2017 letter from Dr. Fairbanks to Dr. Calvert, which Barens provided to Leighton, does not undermine West's allegations of fraud and medical battery.

38

Dr. Fairbanks explained in his letter that he had declined to accept West back as a patient because of her "past history of noncompliance" in 2009. Specifically, West did not follow his surgical recommendation to remove an implant in her nose that had caused her nose to become infected. Dr. Fairbanks also stated in his letter that West's medical records did not support her claim Dr. Calvert placed Gore-Tex in her nose that contributed to her nose infections. The letter does not provide any information material to the allegations Dr. Calvert falsely characterized cosmetic procedures as medically necessary, performed additional unconsented procedures to bill his patients' insurers, or allowed USC fellows to perform surgery on his patients. Further, the letter confirms West's allegations that Dr. Calvert performed multiple surgeries on her nose from 2013 to 2017 and West believed things had "'gone wrong'" after the first surgery.

Thus, to the extent Melugin's reporting of West's and Hakala's statements at the press conference—that more 20 new alleged victims had contacted Hakala—exceeded the scope of West's second amended complaint, Dr. Calvert's claims based on these statements fail because he did not show the Fox defendants published the statements with actual malice.

Nor has Dr. Calvert shown the Fox defendants had other reasons to doubt the allegations of Houston. Dr. Calvert contends the Fox defendants knew the Medical Board had rejected Houston's complaint against Dr. Calvert, relying on the February 8, 2017 letter from the Medical Board to Dr. Calvert. But the Calvert plaintiffs presented no evidence the Fox defendants knew of Houston's complaint to the Medical Board, the nature of the complaint, or the February 8, 2017 letter

39

(addressed only to Dr. Calvert). Further, the letter indicates only that Houston's complaint alleged "negligent treatment" by Dr. Calvert, not insurance fraud as alleged by Houston in the May 13 report.

Dr. Calvert alternatively contends the statement by Melugin in his May 13 report that Dr. Calvert declined to comment on Houston's allegations evidenced actual malice because the Fox defendants intentionally concealed from Dr. Calvert and his attorneys that they had interviewed Houston, and had the Calvert plaintiffs known this, they would have refuted Houston's allegations. But Dr. Calvert provides no authority for the proposition the Fox defendants were required to divulge their sources to Dr. Calvert. Further, Melugin included in his report Barens's statement that "'[e]very procedure performed by Dr. Calvert on every patient was consented to in writing prior to the procedure by the respective patient.'" The inclusion of this denial in the broadcast undermines the Calvert plaintiffs' argument the Fox defendants harbored actual malice.

Dr. Calvert's reliance on *Antonovich v. Superior Court* (1991) 234 Cal.App.3d 1041 is misplaced. There, the Court of Appeal concluded the plaintiff, a former elected official, had submitted sufficient evidence of actual malice to survive summary judgment on his defamation claim against his successor, where he presented evidence that his successor failed to investigate whether the allegedly defamatory statement was true—that the former official had destroyed office files after he lost the election. (*Id*. at pp. 1051-1052.) In finding a triable issue as to actual malice, the court relied on evidence the former official left vast quantities of files in his vacated office that were maintained by the predecessor's staff for at least eight years. (*Id*.

40

at p. 1052.) Here, Dr. Calvert has not submitted evidence the Fox defendants had access to, but failed to consult, clear evidence of the falsity of the reported allegations.

The trial court therefore erred in denying the Fox defendants' special motion to strike as to Melugin's reporting of West's and Hakala's statements at the press conference that over 20 potential victims had contacted Hakala (complaint ¶¶ 77, 81), and Melugin's and Houston's statements regarding Houston's allegations (complaint ¶¶ 37-45, 52-55, 60-61, 63-65, 78).[12]

F.    *The Trial Court Did Not Err in Denying Houston's Special Motion To Strike the Complaint as to Dr. Calvert's Claims*
      1.    *Dr. Calvert adequately pleaded Houston acted with actual malice and carried his burden to show a probability he can produce clear and convincing evidence of actual malice*

Houston contends Dr. Calvert failed adequately to plead that Houston acted with actual malice because the complaint did not provide sufficient facts, including details about the Medical Board complaint. Houston also argues Dr. Calvert failed to meet his burden to present clear and convincing evidence of actual malice. Neither contention has merit.

In order to establish a probability of prevailing on a claim as part of the second step of the anti-SLAPP analysis, a plaintiff must ""state[ ] and substantiate[ ] a legally sufficient claim."" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821;

---

[12]    Because we reverse the trial court's denial of the Fox defendants' special motion to strike, we do not reach their argument the Calvert plaintiffs failed to comply with section 48a's requirement that they timely demand a retraction.

41

accord, *Taus, supra*, 40 Cal.4th at p. 713.) Where the plaintiff is a public figure, a defamation complaint that "fails to plead that defendant made the challenged statements with 'actual malice,'" that is "'with knowledge that it was false or with reckless disregard of whether it was false or not,'" is legally insufficient. (*Vogel v. Felice* (2005) 127 Cal.App.4th 1006, 1017.) Dr. Calvert's complaint adequately alleged defendants published the defamatory statements "with actual malice, defined as knowledge of falsity or reckless disregard for truth or falsity," as shown by, among other things, Houston's awareness the Medical Board had rejected his complaint against Dr. Calvert, thereby "exonerating Dr. Calvert." Further, as discussed below with regard to Dr. Calvert's offer of proof on this issue, Dr. Calvert's allegations Houston falsely accused Dr. Calvert of threatening his patients fairly allege Houston fabricated at least some of his accusations against Dr. Calvert and therefore made his statements with knowledge of their falsity.

*Vogel v. Felice, supra*, 127 Cal.App.4th 1006, relied on by Houston, is distinguishable. There, the Court of Appeal concluded the trial court erred in denying the defendant's special motion to strike the complaint for defamation, explaining the complaint's "conclusory boilerplate allegation that defendant acted 'maliciously and oppressively, and in conscious disregard of [plaintiffs'] rights'" was not sufficient to plead actual malice. (*Id.* at p. 1018.) Here, the Calvert plaintiffs pleaded the correct constitutional standard, as well as specific facts to show Houston's actual malice.

*Tschirky v. Superior Court* (1981) 124 Cal.App.3d 534, also relied on by Houston, is not on point because the court applied the standard for actual malice for purposes of the common

42

interest privilege now codified at section 47, subdivision (c), not the constitutional standard for pleading actual malice to support a defamation claim brought by a public figure first articulated in *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279-280. Further, the *Tschirky* court concluded the plaintiff had not adequately pleaded facts supporting his allegations of actual malice because he alleged only that the defendant published the challenged statements out of ill will toward the plaintiff and his desire to oppress the plaintiff, without any supporting facts. (*Tschirky,* at p. 539.)  By contrast, the allegations here, which used the *Sullivan* standard for constitutional malice, alleged the defendants acted "with actual malice, defined as knowledge of falsity or reckless disregard for truth or falsity."  (See *Sullivan*, at pp. 279-280.)  These allegations, along with the additional alleged facts, were sufficient to plead malice.[13]  (See *Mullins v. Brando* (1970) 13 Cal.App.3d 409, 419-420 [complaint alleging "statement and publication was made by defendants with evil motive and malice, wil[l]fully and wrongfully, and with intent to injure, disgrace and defame plaintiffs and with wanton and reckless disregard for the truth or falsity of the statements made" sufficiently pleaded actual malice in defamation action involving public figure].)

---

[13]  *Resolute Forest Products, Inc. v. Greenpeace International* (N.D. Cal. 2017) 302 F.Supp.3d 1005 and *Wynn v. Chanos* (N.D. Cal. 2014) 75 F.Supp.3d 1228, cited by the Fox defendants in arguments joined by Houston, do not support Houston's position. These federal authorities apply the federal pleading standard under rule 12(b)(6) of the Federal Rule of Civil Procedure, not California procedural rules.  (See *Resolute Forest*, at p. 1015; *Wynn*, at p. 1233.)

Houston's contention Dr. Calvert did not meet his burden to establish a probability he can produce clear and convincing evidence of actual malice fares no better. Houston argues Dr. Calvert's denials of misconduct are not sufficient to establish Houston's actual malice. Houston is correct that Dr. Calvert's statements in his declaration that he properly billed Houston's insurance company for the surgical procedures he performed on Houston do not show that Houston's statements to the contrary were made with knowledge the statements were false or reckless disregard for their truth. However, Dr. Calvert's statement in his declaration that "[he] never threatened Houston physically nor . . . ever threatened him with criminal or civil liability . . . in late 2015 or any time regarding any alleged insurance fraud" is of a different nature because it directly contradicts Houston's statement in the May 13 report that he feared Dr. Calvert because Dr. Calvert "threaten[ed]" him when Houston confronted Dr. Calvert about his billing practices. As Houston asserted in the report, Dr. Calvert told him, "[I]f I go down for insurance fraud I'm taking you with me." If Dr. Calvert did not make threatening statements toward Houston, this can only mean Houston fabricated the statements.

Therefore, if we accept as true Dr. Calvert's denial that he had ever threatened Houston, as we must in evaluating Dr. Calvert's evidence at the second step of the anti-SLAPP analysis (*Sweetwater, supra*, 6 Cal.5th at p. 940), it follows that Houston fabricated his allegations Dr. Calvert had threatened him. On these facts, it would be a reasonable inference that Houston harbored personal hostility against Dr. Calvert and acted with actual malice in making his allegations of insurance fraud. (See *Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S.

44

496, 517, 521(*Masson*) ["a deliberate alteration of the words uttered by a plaintiff" may demonstrate the defendant deliberately or recklessly altered his quotation of what the defendant said if "the alteration results in a material change in the meaning conveyed by the statement"]; *Reader's Digest v. Superior Court, supra*, 37 Cal.3d at p. 257 [the defendant publisher's "[p]rofessions of good faith will be unlikely to prove persuasive . . . where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call."]; *Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 85 ["malice may be inferred where . . . 'a story is fabricated by the defendant, [and] is the product of his imagination'"].)

Houston's attempt to distinguish *Masson* as involving alteration of a written quote is unpersuasive. As the United States Supreme Court observed in *Masson*, "[t]he use of quotations to attribute words not in fact spoken bears in a most important way on [the actual malice] inquiry . . . ." (*Masson, supra*, 501 U.S. at p. 517.) Here, Dr. Calvert produced sufficient evidence Houston attributed threatening words to him that he had not spoken. This was sufficient to carry Dr. Calvert's burden to demonstrate the minimal merit required at the second step of the anti-SLAPP analysis.[14] (See *Bonni, supra*, 11 Cal.5th at p. 1009.)

---

[14] Houston also argues the trial court erred in considering the February 8, 2017 letter resolving the Medical Board complaint against Dr. Calvert because it was inadmissible hearsay. As a threshold matter, for purposes of opposing a special motion strike, Dr. Calvert was only required to show it was "reasonably possible" the letter would be admissible at trial under Evidence

45

2.	*The litigation privilege does not protect Houston's statements*

Section 47, subdivision (b), makes privileged any publication or broadcast that is made "[i]n any . . . judicial proceeding, [or] in any other official proceeding authorized by law . . . ."  "The litigation privilege is also 'relevant to the second step in the anti-SLAPP analysis in that it may present a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 323; accord, *Trinity Risk Management, LLC v. Simplified Labor Staffing Solutions, Inc.* (2021) 59 Cal.App.5th 995, 1006 (*Trinity*).)  Thus, Dr. Calvert cannot establish a probability of prevailing if the litigation privilege precludes a finding of liability on the defamation claims based on Houston's statements.  The litigation privilege does not apply.

Houston contends section 47, subdivision (b)'s litigation privilege protects his statements published in the reports because he is a "potential witness" in West's lawsuit, citing *Trinity, supra,* 59 Cal.App.5th at pages 1006 to 1007.  Houston's reliance on *Trinity* is misplaced.  There, the Court of Appeal concluded prelitigation emails were protected because they were

_____

Code section 1280's hearsay exception for official records. (*Sweetwater, supra,* 6 Cal.5th at p. 949.)  But we need not reach whether the court properly considered the letter because Dr. Calvert carried his burden to show a probability he can produce clear and convincing evidence Houston acted with actual malice based on evidence Houston fabricated his allegation that Dr. Calvert threatened him.

46

"essentially . . . discovery request[s]" that were "made in preparation for or in anticipation of litigation," which commenced less than two weeks after the emails were sent. (*Trinity,* at p. 1005.) By contrast, nowhere in the reports is Houston identified as a potential witness in West's litigation, nor has Houston produced any evidence showing he was or will be a witness or otherwise involved in the litigation.

### 3. *Houston's remaining arguments fail*

Houston contends the trial court should have granted his special motion to strike three of the allegedly false statements identified in the complaint (in paragraphs 41, 42, and 54), which the Calvert plaintiffs conceded were not actionable but were included for context in support of their claims for relief. Houston argues it was error for the trial court to allow Dr. Calvert to withdraw or amend those statements. (See *Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068, 1073 [Code of Civil Procedure section 425.16 does not allow a plaintiff to "amend[] the complaint once the court finds the requisite connection to First Amendment speech" to remove allegations of protected conduct."].) However, the trial court did not allow Dr. Calvert to amend his complaint; rather, it denied Houston's request to strike the three statements because they were nonactionable statements included only for context. This was proper. As discussed, allegations of protected activity that only provide context without supporting a claim for recovery cannot be

47

stricken.  (*Bonni, supra,* 11 Cal.5th at p. 1012; *Baral, supra,* 1 Cal.5th at p. 394.)[15]

Finally, Houston argues the trial court erred in failing to strike paragraph 61 of the complaint, which alleges the May 13 report "displayed photographs of Houston's chest, calculated to convey and reinforce to viewers the false impression that Dr. Calvert had committed malpractice."  Houston broadly contends "[p]hotographs are not false statements of fact and cannot constitute defamation."  Houston has forfeited this argument by failing to support it with citation to relevant legal authority.[16]  (See *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 ["'[T]o demonstrate error, an appellant must supply the reviewing court with some cogent argument

---

[15] The context allegations include the statements in the May 13 report that "'Houston tells [KTTV] he also wanted a more masculine jawline, so he went to Dr. Calvert for jaw implants'" (complaint ¶ 41); Dr. Calvert told Houston that if he allowed Dr. Calvert to film the surgery, "'there's no charge'" (*id.* ¶ 42); and KTTV's report that "'five years later, Calvert's former patients say, history is repeating itself'" (*id.* ¶ 54).  Although not argued by Houston on appeal, the context allegations also include the statements in the May 13 report that Dr. Calvert reported "'a box fell on Houston's nose'" and caused an airway obstruction, and that Houston "'went to Calvert for chest implants, which had to be revised twice, as well as a breast reduction and multiple liposuction surgeries.'"  (Complaint ¶¶ 38, 60.)

[16] Houston only relies on the statement in our opinion in *Jackson, supra*, 10 Cal.App.5th at page 1261 that actionable defamation must imply a "'''provably false assertion of fact.'''"  *Jackson* did not involve a defamation claim based on the publication of photographs, nor did we hold a defamation claim may never be based on publication of photographs.

supported by legal analysis and citation to the record.'"]; *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287 ["[W]e may disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt."].)

## DISPOSITION

The order denying the Fox defendants' special motion to strike is reversed. The cause is remanded to the trial court with directions to vacate the order denying the Fox defendants' special motion to strike and to enter a new order granting the motion. The order denying Houston's special motion to strike is reversed as to the claims asserted by the professional corporation but affirmed as to the claims asserted by Dr. Calvert. On remand the trial court is to vacate the order denying Houston's special motion to strike and to enter a new order granting Houston's special motion to strike as to the professional corporation but denying the motion as to Dr. Calvert.

The Fox defendants are to recover their costs on appeal. Houston and the Calvert plaintiffs are to bear their own costs on appeal.

FEUER, J.

We concur:

PERLUSS, P. J.                SEGAL, J.

49